HARSH P. PARIKH (SBN 281402)
hparikh@nixonpeabody.com
JONAH D. RETZINGER (SBN 326131)
jretzinger@nixonpeabody.com
CHRISTOPHER D. GRIGG (SBN 220243)
cgrigg@nixonpeabody.com
MORGAN C. NIGHAN (admitted *Pro Hac Vice*)
mnighan@nixonpeabody.com
NIXON PEABODY LLP
300 South Grand Avenue, Suite 4100
Los Angeles, California 90071-3151
Tel:  (213) 629-6000
Fax:  (213) 629-6001

MICHAEL S. HELSLEY (SBN 199103)
mhelsley@wjhattorneys.com
JOHN P. KINSEY (SBN 215916)
jkinsey@wjhattorneys.com
COLLEEN E. LITTLE (SBN 352554)
clittle@wjhattorneys.com
WANGER JONES HELSLEY PC
265 East River Park Circle, Suite 310
Fresno, California 93720
Tel: (559) 233-4800
Fax: (559) 233-9330

*Attorneys for Respondents* COMMUNITY HOSPITALS
OF CENTRAL CALIFORNIA and FRESNO
COMMUNITY HOSPITAL AND MEDICAL CENTER
d/b/a COMMUNITY HEALTH SYSTEM

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CULTIVA LA SALUD, a nonprofit community benefit organization; and FRESNO BUILDING HEALTHY COMMUNITIES, a nonprofit community benefit organization,<br><br>Petitioners,<br><br>vs.<br><br>COMMUNITY HOSPITALS OF CENTRAL CALIFORNIA, a California Non-profit Public Benefit Corporation; FRESNO COMMUNITY HOSPITAL AND MEDICAL CENTER d/b/a COMMUNITY HEALTH SYSTEM, a California Non-profit Public Benefit Corporation; BOARD OF TRUSTEES FOR COMMUNITY HOSPITALS OF CALIFORNIA AND FRESNO | Case No. 1:24-cv-01065-JLT-EPG<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RESPONDENTS' MOTION TO DISMISS THE PETITION PURSUANT TO FED. R. CIV. P. 12(b)(6)**<br><br>Hearing Date: December 17, 2024<br>Hearing Time: 9:00 a.m.<br>Courtroom: 4<br><br>U.S. District Judge: Hon. Jennifer L. Thurston<br><br>Magistrate Judge: Hon. Erica P. Grosjean |

1  COMMUNITY HOSPITAL, and DOES 1 through
2  15, inclusive,

           Respondents.
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................ 1

II.    BACKGROUND ................................................................ 3

    A.    The Medi-Cal Program ................................................ 4

        1.    Disproportionate Share Hospital Payments ................ 5

        2.    Hospital Quality Assurance Fee Payments ................ 6

    B.    California Government Code § 11135 ........................... 7

III.    ARGUMENT ................................................................ 7

    A.    Petitioners' First Cause of Action for Unlawful Expenditures of
Federal and State Funds Fails to State a Claim ................ 8

        1.    Petitioners Fail to State a Claim Based on
Violations of DSH Payment Authorities ................ 9

        2.    Petitioners Fail to State a Claim Based on
Violations of HQAF Payment Authorities ................ 11

        3.    Petitioners Have No Private Right of Action
to Challenge CHS's Use of DSH or HQAF Payments ........... 12

        4.    Cal. Civ. Proc. Code § 526a Does Not Provide a
Mechanism for Petitioners to Assert Their
First Cause of Action. ................................ 15

    B.    Petitioners' Second Cause of Action Fails to State
a Claim ................................................ 16

        1.    Cal. Gov't Code § 11135 Does Not Require
Respondents to Direct HQAF or DSH
Supplemental Payments to "Black and
Latino low-income patients." ........................ 17

        2.    Petitioners Are Not in a Protected Class ................ 17

        3.    Petitioners Have Not Pled Facts Supporting
a Disparate Impact on a Protected Class ................ 19

IV.    CONCLUSION ................................................ 22

1

**TABLE OF AUTHORITIES**

2

**Federal Cases**                                                                                           **Page(s)**

3

*Ashcroft v. Iqbal,*

4
    556 U.S. 662 (2009) .................................................................................................... 8

5

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................................................... 7

6

7

*Children's Hosp. Ass'n of Texas v. Azar,*
    933 F.3d 764 (D.C. Cir. 2019) .................................................................................. 4

8

*D.C. Hosp. Ass'n v. D.C.,*

9
    224 F.3d 776 (D.C. Cir. 2000) .................................................................................. 4

10

*Darensburg v. Metro. Transp. Comm'n,*
    636 F.3d 511 (9th Cir. 2011) ............................................................................ *passim*

11

*Election Integrity Project California, Inc. v. Weber,*

12
    113 F.4th 1072 (9th Cir. 2024) ................................................................................ 8

13

*Flores v. EMC Mortg. Co.,*

14
    997 F. Supp. 2d 1088 (E.D. Cal. 2014) .................................................................. 2

15

*Gen-Probe, Inc. v. Amoco Corp.,*
    926 F. Supp. 948 (S.D. Cal. 1996) .......................................................................... 2

16

17

*In re Gardens Reg'l Hosp. & Med. Ctr., Inc.,*
    975 F.3d 926 (9th Cir. 2020) .................................................................................... 4

18

*Landers v. Quality Commc'ns, Inc.,*

19
    771 F.3d 638 (9th Cir. 2014) .................................................................................... 8

20

*Louisiana Dep't of Health & Hosps. v. Ctr. for Medicare & Medicaid Servs.,*
    346 F.3d 571 (5th Cir. 2003) .................................................................................... 5

21

22

*Prescott v. Rady Children's Hosp.-San Diego,*
    265 F. Supp. 3d 1090 (S.D. Cal. 2017) ................................................................ 18

23

*Virginia Dep't of Med. Assistance Servs. v. Johnson,*

24
    609 F. Supp. 2d 1 (D.D.C. 2009) ............................................................................ 5

25

**State Cases**

26

*Blumhorst v. Jewish Family Services of Los Angeles,*
    126 Cal. App. 4th 993 (2005) ........................................................................... 18,19

27

*Carter v. CB Richard Ellis, Inc.,*

28
    122 Cal. App. 4th 1313 (2004) ..................................................................... 20, 21,22

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RESPONDENTS' MOTION TO DISMISS
THE PETITION PURSUANT TO FED. R. CIV. P. 12(b)(6)

*Coshow v. City of Escondido,*
    132 Cal. App. 4th 687 (2005)..................................................................................................... 16

*In re Cnty. Inmate Tel. Serv. Cases,*
    48 Cal. App. 5th 354 (2020).................................................................................................. 21,22

*Garfield Med. Ctr. v. Belshe,*
    68 Cal. App. 4th 798 (1998)...................................................................................................... 5

*Julian v. Mission Community Hosp.*
    11 Cal. App. 5th 360 (2017)..................................................................................................... 11

*Lu v. Hawaiian Gardens Casino, Inc.*
    50 Cal.4th 592 (2010) ............................................................................................................. 12

*Monterey Coastkeeper v. Central Coast Reg'l Water Quality Control Bd,*
    76 Cal. App. 5th 1 (2022)........................................................................................................... 8

*Noe v. Superior Court*
    237 Cal. App. 4th 316 (2015)...................................................................................... 12, 13, 14

*Rosales v. City of Los Angeles*
    82 Cal. App. 4th 419 (2000).................................................................................................... 14

*Thurman v. Bayshore Transit Mgmt., Inc.*
    203 Cal. App. 4th 1112 (2012)................................................................................................ 12

*Villafana v. County of San Diego,*
    57 Cal. App. 5th 1012 (2020)............................................................................................ 19, 20

*Waste Mgmt. of Alameda Cty., Inc. v. County of Alameda,*
    79 Cal. App. 4th 1223 (2000).................................................................................................. 15

**Federal Statutes**

42 U.S.C. § 1396a .......................................................................................................................... 5

42 U.S.C. § 1396r-4 .................................................................................................................... 5, 9

Fed. R. Civ. P. 12(b)(6) ................................................................................................................. 8

**State Statutes**

Cal. Civ. Proc. Code § 526a .................................................................................................... 15, 16

Cal. Gov't Code § 11135 ...................................................................................................... *passim*

Cal. Welf. & Inst. Code § 14105.98.................................................................................... *passim*

Cal. Welf. & Inst. Code § 14166 ................................................................................................... 6

Cal. Welf. & Inst. Code § 14166.11 ................................................................. 9

Cal. Welf. & Inst. Code § 14166.12 ........................................................ 10, 12, 13

Cal. Welf. & Inst. Code § 14169.50 ....................................................... *passim*

Cal. Welf. & Inst. Code § 14169.52 ............................................................. 13, 14

Cal. Welf. & Inst. Code § 14169.53 ............................................................. 11, 13

Cal. Welf. & Inst. Code § 14169.56 ................................................................. 11

Cal. Welf. & Inst. Code § 14169.57 ................................................................. 11

Cal. Welf. & Inst. Code § 14169.62 ................................................................. 14

Cal. Welf. & Inst. Code § 14169.68 ................................................................. 11

Cal. Welf. & Inst. Code § 14169.69 ................................................................. 14

**Federal Regulations**

42 C.F.R. § 447.294 ....................................................................................... 5

42 C.F.R. § 447.295 ..................................................................................... 10

42 C.F.R. § 447.299 ....................................................................................... 5

**Other Authorities**

April 4, 2024 Letter from Alexis Gibson, Acting Director, Division of Managed
   Care Policy, Center for Medicaid and CHIP Services, to Tyler Sadwith,
   Medicaid Director, Health Care Programs, DHCS,
   https://www.medicaid.gov/medicaid/managed-
   care/downloads/CA_Fee_IPH.OPH1_Renewal_20240101-20241231.pdf ............................ 6

Attachment 4.19-A to the California Medicaid State Plan, Increase in Medicaid
   Payment Amounts for California Disproportionate Share Hospitals,
   https://www.dhcs.ca.gov/formsandpubs/laws/Documents/Attachment-4-19A-
   p18-37.pdf ........................................................................................... 6, 10

California Secretary of State Archive, Proposition 52 Official Voter Information
   Guide, https://vigarchive.sos.ca.gov/2016/general/en/quick-reference-
   guide/52.htm ........................................................................................... 7

Centers for Medicare and Medicaid Services, FY 2025 Final Rule: HCRIS Data
   File, https://www.cms.gov/medicare/payment/prospective-payment-
   systems/acute-inpatient-pps/fy-2025-ipps-final-rule-home-page#data providing
   provider numbers, hospital names, and states for hospitals included in the
   Hospital-2020 FY 2022 Data Files ......................................................... 2

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RESPONDENTS' MOTION TO
DISMISS THE PETITION PURSUANT TO FED. R. CIV. P. 12(b)(6)

Centers for Medicare and Medicaid Services, Hospital-2020 FY 2022,
  https://www.cms.gov/httpswwwcmsgovresearch-statistics-data-and-
  systemsdownloadable-public-use-filescost-reportscost/hospital-2010-fy-2022 ...................... 2

Committee Rep't on Sen. Bill 239 ................................................................................................ 16

DHCS, Hospital Quality Assurance Fee Program,
  https://www.dhcs.ca.gov/provgovpart/Pages/hqaf.aspx ............................................................ 6

DHCS, Medi-Cal Provider Agreement (DHCS 6208),
  https://www.dhcs.ca.gov/services/ltc/Documents/DHCS6208.pdf........................................... 13

DHCS, Medicaid - Disproportionate Share Hospital Program,
  https://www.dhcs.ca.gov/provgovpart/Pages/DisproportionateShareHospital.as
  px................................................................................................................................................ 5

DHCS, SPCP – History/Archive,
  https://www.dhcs.ca.gov/services/spcp/Pages/default.aspx..................................................... 10

Emergency Medical Services Authority, Report to Commission: Ambulance
  Patient Offload Delays, June 2022, https://emsa.ca.gov/wp-
  content/uploads/sites/71/2022/10/June2022CommissionReport.pdf ......................................... 2

Medicaid, Medicaid Disproportionate Share Hospital (DSH) Payments,
  https://www.medicaid.gov/medicaid/financial-management/medicaid-
  disproportionate-share-hospital-dsh-payments/index.html....................................................... 5

Tiffany N. Ford, Commonwealth Fund, Medicaid Reimbursement Rates Are a
  Racial Justice Issue, https://www.commonwealthfund.org/blog/2022/medicaid-
  reimbursement-rates-are-racial-justice-issue ............................................................................. 4

## MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to Fed. R. Civ. P. 12(b)(6), Respondents Community Hospitals of Central California ("CHCC") and Fresno Community Hospital and Medical Center d/b/a Community Health System ("CHS") (collectively, "Respondents") submit this memorandum in support of their motion to dismiss Petitioners Cultiva La Salud ("Cultiva") and Fresno Building Healthy Communities' ("Fresno BHC") (collectively, "Petitioners") Petition for Writ of Mandate and Complaint for Declaratory Relief (the "Petition").

## I.     INTRODUCTION

Respondent CHS is a nonprofit healthcare system based in Fresno County. Petition ¶ 7. CHS is the leading healthcare provider in the San Joaquin Valley and owns and operates multiple hospitals and healthcare facilities, including Clovis Community Medical Center ("CCMC"), located in Clovis, California, and Community Regional Medical Center ("CRMC"), located in downtown Fresno, California.[1] *Id.* Respondent CHCC is CHS's sole member.[2] *Id.*

Petitioners are two nonprofit community organizations who, according to the Petition, serve low-income, indigent, and undocumented residents of Fresno County and urban Fresno neighborhoods.[3] Through this action, Petitioners seek to challenge Respondents' alleged use of certain payments made to CHS as a participant in the Medi-Cal program, the public health insurance program financed jointly by the federal government and the State of the California which reimburses providers for needed health care services for low-income individuals. Specifically,

---

[1] The distance between CCMC and CRMC is approximately 10 miles. Both facilities provide 24-hour emergency care and both facilities serve residents of both Fresno and Clovis. In FY 2023, for instance, Fresno and Clovis residents comprised 51% and 22%, respectively, of patient encounters at CCMC. *See* HCAI, *Patient Origin/Market Share Pivot Profile-Inpatient, Emergency Department, and Ambulatory Surgery* (2022-2023 data), available at https://data.chhs.ca.gov/dataset/patient-origin-market-share-pivot-profile-inpatient-emergency-department-and-ambulatory-surgery. Moreover, while CRMC is located in downtown Fresno, its patients come from CHS's entire service area, unsurprising considering that CRMC's offerings – including the region's only Level 1 trauma and comprehensive burn center, the Valley's largest Level 3 neonatal ICU, and an affiliation with a leading medical school – are unavailable at any other hospital in the region, including CCMC. Fresno residents accounted for only 64% of CRMC's patient encounters in FY 2023. *Id.*

[2] While Petitioners allege both that CHS is a non-profit public benefit corporation and that CHS is a wholly-owned subsidiary of CHCC, as CHS is a non-profit public benefit corporation, CHS cannot have an owner. CHS thus interprets Petitioners' pleading to allege that CHCC is the sole member of CHS.

[3] According to the disclosure statement filed by Petitioners in this action, Petitioners have no members. Dkt. 10.

Petitioners aim to compel Respondents to redirect funds from CCMC to CRMC based on allegations that Respondents' investments in CCMC unlawfully prioritize wealthier patients over low-income residents of Fresno County in violation of federal law and California law. Petitioners seek: (i) a declaration that payments made to Respondents pursuant to two Medi-Cal programs—the Hospital Quality Assurance Fund ("HQAF") program and the Disproportionate Share Hospital ("DSH") program—must be used exclusively to benefit low-income patients and to increase low-income residents' access to medical care; (ii) injunctive relief requiring Respondents to spend HQAF and DSH payments exclusively for the benefit of the low-income patient population primarily served by CRMC; and (iii) injunctive relief compelling Respondents to remedy their allegedly discriminatory allocation of resources.[4]

Respondents acknowledge and appreciate Petitioners' commitment to the community and to those most in need of advocacy. Indeed, Respondents' mission is to better the lives of all those served by CHS. CRMC is central to that mission, providing more care to Medi-Cal patients than any other hospital in California.[5] However, the authorities relied upon by Petitioners do not provide an avenue for Petitioners to challenge Respondents' financial decisions and unilaterally apply restrictions to Medi-Cal payments.

---

[4] The Petition lumps Respondents together and fails to allege the specific conduct engaged in by each Respondent (or even which Respondent actually received the Medi-Cal payments referenced in the Petition). While the Court need not address this issue in light of the many other reasons warranting disposition of this action as set forth in this memorandum, such pleading deficiency independently renders the Petition uncertain and subject to dismissal. *See, e.g., Flores v. EMC Mortg. Co.*, 997 F. Supp. 2d 1088, 1103 (E.D. Cal. 2014) (dismissal warranted where "[t]he complaint lacks specific, clearly defined allegations of each defendant's alleged wrongs to give fair notice of claims plainly and succinctly…"); *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 960-961 (S.D. Cal. 1996) (holding that lumping all defendants together failed to provide each defendant with proper notice of the claims asserted against them).

[5] *See* Centers for Medicare and Medicaid Services, Hospital-2020 FY 2022 Data Files, available at https://www.cms.gov/httpswwwcmsgovresearch-statistics-data-and-systemsdownloadable-public-use-filescost-reportscost/hospital-2010-fy-2022 (providing cost reporting data for all hospitals, which includes data on each hospital's "Medicaid days" (*i.e.*, the total of all days each Medicaid patient remained at the hospital)); Centers for Medicare and Medicaid Services, FY 2025 Final Rule: HCRIS Data File, available at https://www.cms.gov/medicare/payment/prospective-payment-systems/acute-inpatient-pps/fy-2025-ipps-final-rule-home-page#data (providing provider numbers, hospital names, and states for hospitals included in the Hospital-2020 FY 2022 Data Files); *see also* Emergency Medical Services Authority, Report to Commission: Ambulance Patient Offload Delays, June 2022, at p. 119, 129, available at https://emsa.ca.gov/wp-content/uploads/sites/71/2022/10/June2022CommissionReport.pdf (indicating that CRMC receives more ambulances or "offloads" than any other hospital in California).

For the reasons set forth below, Petitioners' claims are deficient as a matter of law. Their first cause of action fails to allege any illegal expenditures by Respondents and fails to cite any authority that would create a private right of action authorizing Petitioners to pursue the relief sought in their Petition. Moreover, Petitioners' legal contentions are not supported by the plain text of applicable authorities, which do not restrict a hospital's use of HQAF and DSH payments; indeed, any such restrictions would be inconsistent with the purposes of the HQAF and DSH programs, which were created to reimburse health care providers, like CHS, for treating large numbers of Medi-Cal patients. Petitioners' second cause of action similarly fails as Petitioners— who are not members of a Protected Class—inappropriately rely on California Government Code § 11135 and fail to plausibly plead facts to support their allegations of disparate impact.

Fundamentally, Respondents share Petitioners' desire to ensure that all members of the communities served by CHS have access to critical, quality healthcare services. Indeed, Respondents have expended <u>billions</u> of dollars and untold time and energy in pursuit of that shared goal. But, while Petitioners may disagree with certain of Respondents' decisions, such disagreement alone does not mean that Petitioners have a viable legal claim (or that Petitioners may mire Respondents in litigation in an attempt to coerce Respondents to do whatever Petitioners want Respondents to do). Indeed, to hold otherwise would allow a private entity (in this case, two nonprofit corporations), completely disassociated from a healthcare organization's finances, to challenge—and, in effect, potentially dictate—how such organization should spend its limited resources. The authorities Petitioners invoke do not support such an outcome.

Accordingly, for the following reasons, this Court should dismiss the Petition in its entirety with prejudice.

## II.    BACKGROUND

The Petition generally challenges Respondents' expenditure of HQAF and DSH program funds, and further alleges that Respondents' investment decisions constitute unlawful discrimination in violation of California Government Code § 11135. *See* Petition ¶¶ 105-121.

**A.  The Medi-Cal Program**

As Petitioners note, "Medicaid is a federal-state cooperative program for the provision of medical care to certain low-income populations, which is jointly funded by the federal and state governments and administered by the states." Petition ¶ 15 at 9:15-20.

Authorized by Title XIX of the Social Security Act, Medicaid was signed into law in 1965. The purpose of the Medicaid program is to ensure access to healthcare for those who cannot afford it. All states, the District of Columbia, and the U.S. territories have Medicaid programs. California's Medicaid program is known as "Medi-Cal." It is administered by the California Department of Health Care Services ("DHCS") through a California Medicaid State Plan approved by the federal government through the Centers for Medicare and Medicaid Services ("CMS"). *See, e.g., In re Gardens Reg'l Hosp. & Med. Ctr., Inc.,* 975 F.3d 926, 929 (9th Cir. 2020) (explaining California's participation in the Medicaid program).

It is widely recognized that reimbursements for services under state Medicaid programs fall far short of covering the true cost of care.[6] *See Children's Hosp. Ass'n of Texas v. Azar*, 933 F.3d 764, 767–68 (D.C. Cir. 2019) ("Treating the indigent proves costly even for hospitals that receive Medicaid payments."); *D.C. Hosp. Ass'n v. D.C.*, 224 F.3d 776, 777 (D.C. Cir. 2000) (recognizing the "greater costs it found to be associated with the treatment of indigent patients"). Indeed, "not all hospital services are covered by Medicaid; not all costs associated with covered services are allowed by Medicaid; and Medicaid does not fully reimburse hospitals for all allowable costs associated with covered services." *Azar*, 933 F.3d at 768. For this reason, various supplemental payment programs exist to reimburse healthcare providers, like CHS, that provide healthcare services to large numbers of Medi-Cal and indigent patients.

///

///

---

[6] *See generally* Tiffany N. Ford, Commonwealth Fund, Medicaid Reimbursement Rates Are a Racial Justice Issue, available at https://www.commonwealthfund.org/blog/2022/medicaid-reimbursement-rates-are-racial-justice-issue ("One issue affecting access to care is Medicaid's notably low reimbursement rates: health providers and institutions often spend more money caring for Medicaid beneficiaries than they receive in reimbursement. For example, in 2020 hospitals received only 88 cents for every dollar spent caring for Medicaid patients.").

### 1. Disproportionate Share Hospital Payments

Given the gap between the cost of caring for Medicaid patients and standard Medicaid payment rates, federal law provides for supplemental payments to hospitals providing Medicaid-eligible services to indigent patients to "take into account . . . the situation of hospitals which serve a disproportionate number of low-income patients with special needs." 42 U.S.C. § 1396a(a)(13)(A)(iv). Such supplemental payments are meant "to stabilize the hospitals financially." *Virginia Dep't of Med. Assistance Servs. v. Johnson*, 609 F. Supp. 2d 1, 3 (D.D.C. 2009). Accordingly, federal law requires states to ensure that such hospitals receive an "appropriate increase in the rate or amount of payment for such services" and that such reimbursements "reflect not only the cost of caring for Medicaid recipients, but also the cost of charity care given to uninsured patients." *Louisiana Dep't of Health & Hosps. v. Ctr. for Medicare & Medicaid Servs.*, 346 F.3d 571, 573 (5th Cir. 2003) (discussing 42 U.S.C. § 1396r–4(b)(1), (3)).

Pursuant to 42 U.S.C. § 1396r-4 and implementing federal regulations, federal law requires state Medicaid programs, including Medi-Cal, to make DSH payments to qualifying hospitals that serve a large number of Medicaid and uninsured individuals. *See* 42 U.S.C. § 1396r–4; 42 CFR §§ 447.294-447.299; *see also Garfield Med. Ctr. v. Belshe,* 68 Cal. App. 4th 798, 800 (1998) ("The Disproportionate Share Hospital Supplemental Payment Adjustment Program is a federally-mandated program designed to recognize those hospitals who served a disproportionate number of Medicaid patients.").[7] DSH payments are meant to make healthcare providers, like CHS, that participate in a state's Medicaid program financially whole by compensating them for the "total amount of uncompensated care attributable to Medicaid inpatient and outpatient services." 42 C.F.R. § 447.299(c)(11).

In accordance with federal rules, California statutes and the California Medicaid State Plan further provide for the manner in which DSH eligibility and payments are determined. *See* Cal.

---

[7] *See generally* Medicaid, Medicaid Disproportionate Share Hospital (DSH) Payments, available at https://www.medicaid.gov/medicaid/financial-management/medicaid-disproportionate-share-hospital-dsh-payments/index.html (providing CMS's overview of Medicaid DSH payments); DHCS, Medicaid - Disproportionate Share Hospital Program, available at https://www.dhcs.ca.gov/provgovpart/Pages/DisproportionateShareHospital.aspx (providing DHCS's overview of Medi-Cal DSH payments).

Welf. & Inst. Code § 14166 *et seq*. (providing the formula and methodology for determining private DSH hospital payments); *see also* Cal. Welf. & Inst. Code § 14105.98 *et seq*. (containing provisions applicable to payment adjustments for acute inpatient hospital services provided by disproportionate share hospitals); California Medicaid State Plan Attachment 4.19-A (relating to the increase in Medicaid payment amounts for acute inpatient hospital services for California disproportionate share hospitals). Consistent with these authorities, hospitals, like CHS, are reimbursed for some of the costs associated with inpatient hospital services already provided to Medi-Cal beneficiaries and uninsured individuals. The statutory and regulatory framework governing DSH payments relates exclusively to how DSH payments are determined; there is no authority—cited in the Petition or otherwise—that restricts, conditions, or directs the use of DSH payments after receipt.

**2. Hospital Quality Assurance Fee Payments**

The HQAF program is a health-care related tax program established by statute in 2009. Like the DSH program, the HQAF program provides billions of dollars in supplemental payments to California hospitals for services provided to large numbers of Medi-Cal and uninsured patients. In 2016, the people of California voted to extend indefinitely the HQAF program pursuant to Proposition 52 (a California ballot proposition).

Under the HQAF program, DHCS assesses quarterly fees on private general acute care hospitals. These HQAF program fees are deposited into the DHCS hospital quality assurance revenue fund, and then redistributed, along with federally matched supplemental payments for inpatient and outpatient services, in the form of supplemental payments for services already provided by hospitals to Medi-Cal patients. *See* Cal. Welf. & Inst. Code § 14169.50, *et seq*. The terms applicable to such supplemental payments are subject to CMS approval.[8] Like DSH

---

[8] *See generally* DHCS, Hospital Quality Assurance Fee Program, available at https://www.dhcs.ca.gov/provgovpart/Pages/hqaf.aspx (providing an overview of the HQAF program and linking to the various California Medicaid State Plan amendments applicable to the HQAF program and CMS approval letters); *see, e.g.,* April 4, 2024 Letter from Alexis Gib-son, Acting Director, Division of Managed Care Policy, Center for Medicaid and CHIP Services, to Tyler Sadwith, Medicaid Director, Health Care Programs, DHCS, available at https://www.medicaid.gov/medicaid/managed-care/downloads/CA_Fee_IPH.OPH1_Renewal_20240101-20241231.pdf (containing CMS's ap-proval of Medicaid managed care state directed payments in the form of uniform increases for inpatient and

payments, there are no authorities that restrict, condition, or direct the use of HQAF payments upon receipt. Indeed, the Official Voter Information Guide for Proposition 52 (published in advance of the November 8, 2016 General Election) specifically acknowledged that there are no federal or state requirements attached to HQAF supplemental payments, including any requirements that hospitals spend HQAF supplemental payments for the benefit of specific subpopulations (which would be contrary to the purpose of the Medi-Cal program).[9]

## B. California Government Code § 11135

Separate and apart from Petitioners' allegations relating to Respondents' alleged misuse of DSH and HQAF payments, Petitioners also allege that Respondents' investment decisions constitute unlawful discrimination in state-funded programs in violation of California Government Code § 11135, which provides, in pertinent part:

> No person in the State of California shall, on the basis of sex, race, color, religion, ancestry, national origin, ethnic group identification, age, mental disability, physical disability, medical condition, genetic information, marital status, or sexual orientation, be unlawfully denied full and equal access to the benefits of, . . . any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state.

Cal. Gov't Code § 11135(a). Specifically, Petitioners allege that Respondents' "massive investment" in CCMC and "minimal expenditures" at CRMC "has created and continues to create disparate adverse impacts" on a protected class consisting of "Petitioners,…their clients,…and Black and Latino patients and potential patients who are heavily reliant on [CRMC]." Petition ¶¶ 42; 11-121.

## III.   ARGUMENT

A complaint must be dismissed if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007); Fed. R. Civ. P.

---

outpatient services provided by private hospitals for the rating period January 1, 2024 through December 31, 2024).

[9] *See generally*, California Secretary of State Archive, Proposition 52 Official Voter Information Guide, available at https://vigarchive.sos.ca.gov/2016/general/en/quick-reference-guide/52.htm ("Gives $3 billion to hospital CEOs with no independent audit and no requirement the money is spent on health care. Public funds can be spent on lobbyists, perks and salaries for hospital bureaucrats instead of children and seniors.").

12(b)(6). Determining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A court should dismiss a complaint where it merely "offers labels and conclusions, . . . a formulaic recitation of the elements of a cause of action[,] or naked assertion[s] devoid of further factual enhancement." *Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 641 (9th Cir. 2014) (internal quotations omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal quotations omitted); *Election Integrity Project California, Inc. v. Weber*, 113 F.4th 1072, 1081 (9th Cir. 2024).

For the reasons set forth below, the Petition fails to state a claim upon which relief can be granted. Accordingly, this Court should dismiss Petitioners' claims pursuant to Fed. R. Civ. P. 12(b)(6).

### A. Petitioners' First Cause of Action for Unlawful Expenditures of Federal and State Funds Fails to State a Claim.

Petitioners, via their first cause of action, seek to rewrite federal and state law. Petitioners seek a declaratory judgment that federal and state law require Respondents to "expend HQAF funding for the benefit of low-income and uninsured patients, and to expend DSH funding at the facility where services to low-income patients generated Fresno CRMC's right to receive such funds." Petition ¶ 109 at 46:1-3. Petitioners allege that, "by applying HQAF and DSH funding to expand, equip, and improve their Clovis facility, to pay debt service on bonds for Clovis building projects, to create (and fund losses) for an unnecessary, expensive medical foundation, and to acquire land for further outward expansion" to the detriment of low-income and uninsured patients, Respondents used supplemental DSH and HQAF payments improperly. *Id.* ¶ 106 at 44:10-14. Petitioners' first cause of action, however, fails to state a claim as Petitioners: (1) fail to actually allege violations of any authorities applicable to DSH and HQAF payments; and (2) otherwise have no private right of action or other mechanism authorizing them to pursue their claim.

**1. Petitioners Fail to State a Claim Based on Violations of DSH Payment Authorities.**

Petitioners' first cause of action is founded upon misinterpretations of California statutory provisions that simply are not supported by the plain language of cited authorities. *See Monterey Coastkeeper v. Central Coast Reg'l Water Quality Control Bd*, 76 Cal. App. 5th 1, 16 (2022) (courts "may not consider conclusions of…law…or allegations which are contrary…to law..."). In contending that Respondents have violated California law, Petitioners first seize upon the last sentence of Cal. Welf. & Inst. Code § 14105.98(b), which provides:

> For each fiscal year commencing with 1991-92, there shall be Medi-Cal payment adjustment amounts paid to hospitals pursuant to this section. The amount of payments made and the eligible hospitals for each payment adjustment year shall be determined in accordance with the provisions of this section. The payments are intended to support health care services rendered by disproportionate share hospitals.

Petitioners contend that this statutory provision, enacted over thirty years ago, requires that DSH supplemental payments "be expended *only to* support healthcare services rendered by DSH-qualified hospitals." Petition ¶ 108 at 45:3-4 (emphasis added). Not so.

Petitioners insert a requirement with respect to DSH payments that does not exist. Cal. Welf. & Inst. Code § 14105.98(b)—which effectively amounts to a statement of intent and is not even directly applicable to private hospitals like CHS—does not contain any qualifications or requirements on the use or expenditure of DSH payments. Nor does Petitioners' reading of Cal. Welf. & Inst. Code § 14105.98(b) align with other authorities applicable to DSH payments.

At a high level, DSH payments are determined based on Medicaid and uninsured inpatient and outpatient uncompensated care costs. DSH payments amount to "adjustments…for acute inpatient hospital services <u>provided</u> by a disproportionate share hospital," meaning that they represent supplemental payments for services previously <u>rendered</u> as opposed to conditional funds that must be used to support future services. *See* Cal. Welf. & Inst. Code § 14105.98(a)(5) (defining "payment adjustment" or "payment adjustment amount") (emphasis added); Cal. Welf. & Inst. Code § 14166.11 ("the [DSH] payments made under this section shall be treated as payment adjustments made under [Cal. Welf. & Inst. Code §] 14105.98…"); *see also* 42 U.S.C. § 1396r–

4(c) (setting forth various payment adjustment methodologies for DSH hospitals, including a methodology that "results in an adjustment for each type of hospital that is reasonably related to the costs, volume, or proportion of services <u>provided</u> to [Medicaid] patients…or to low-income patients…"); 42 C.F.R. § 447.295(d)(1) (providing that only costs <u>incurred</u> and revenues <u>received</u> in providing inpatient and outpatient services to Medicaid and uninsured patients are included when calculating costs and revenues for purposes of DSH payment determinations).[10]

Petitioners' contention with respect to California Welfare & Institutions Code § 14166.12 fares no better. In support of their claim, Petitioners only cite subdivision (s)(1)(D), which provides that, in order to be eligible to receive DSH supplemental payments, a hospital must be able to demonstrate "a purpose for additional funding under the selective provider contracting program including proposals relating to emergency services and other health care services…that are made available, or will be made available, to Medi-Cal beneficiaries." While Petitioners do not allege that Respondents ever failed to demonstrate such a purpose, their characterization of Cal. Welf. & Inst. Code § 14166.12(s)(1)(D) as imposing conditions upon DSH funds is again inconsistent with the actual statutory language, which contains no conditions or requirements regarding a recipient's use of DSH payments.[11]

---

[10] *See also* Attachment 4.19-A to the California Medicaid State Plan, Increase in Medicaid Payment Amounts for California Disproportionate Share Hospitals, at p. 20 § (B)(7), available at https://www.dhcs.ca.gov/formsandpubs/laws/Documents/Attachment-4-19A-p18-37.pdf (defining "payment adjustment" or "payment adjustment amount" as the "amount paid or payable…for acute inpatient hospital services <u>provided</u> by an eligible disproportionate hospital)(emphasis added).

[11] Cal. Welf. & Inst. Code § 14166.12 also applies to the Selective Provider Contracting Program ("SPCP"), an inpatient contracting program administered by the California Medical Assistance Commission ("CMAC"). Both SPCP and CMAC were eliminated more than a decade ago. *See* DHCS, SPCP – History/Archive, available at https://www.dhcs.ca.gov/services/spcp/Pages/default.aspx. Since 2013, DHCS has made supplemental payments to qualified private hospitals from the Private Hospital Supplemental Fund pursuant to a discharge-based diagnosis-related groups (DRG) hospital inpatient payment methodology. *See* Supplement 4 to Attachment 4.19-A to the California Medicaid State Plan, Supplemental Reimbursement for Qualified Private Hospitals, at p. 3 § (C)(1), available at https://www.dhcs.ca.gov/formsandpubs/laws/Documents/Supp4-to-Attachment-4-19-A.pdf (providing that "[s]upplemental reimbursement provided by [the Private Hospital Supplemental Fund] will be distributed under a payment methodology based on hospitals services <u>provided</u> to Medi-Cal patients at the eligible hospital.") (emphasis added).

**2. Petitioners Fail to State a Claim Based on Violations of HQAF Payment Authorities.**

As with their claims relating to DSH payments, Petitioners again base their claims with respect to HQAF payments on a single statutory provision that simply does not provide what Petitioners allege it provides. In support of their claim, Petitioners cite California Welfare & Institutions Code § 14169.53(b)(1), a provision applicable to <u>DHCS</u>, which provides that <u>DHCS</u> may only use HQAF program funds exclusively to enhance federal financial participation for hospital services under the Medi-Cal program, to provide additional reimbursement to, and to support quality improvement efforts of, hospitals, and to minimize uncompensated care provided by hospitals to uninsured patients, as well as to pay for the state's administrative costs and to provide funding for children's health coverage, according to an order of priority set by statute.

While Petitioners claim that Respondents' use of HQAF payments is somehow restricted by this statutory authority (which explicitly governs how DHCS is to use the funds generated by HQAF program fees, not CHS's use of HQAF supplemental payments), it plainly contains no such restrictions. And, like DSH payment authorities, HQAF payment authorities state that HQAF payments constitute supplemental payments made to eligible hospitals for services <u>rendered</u>. *See* Cal. Welf. & Inst. Code § 14169.68(a) (providing that "[i]n order to ensure that [HQAF program funds] are used to supplement existing funding for hospital services <u>provided</u> to Medi-Cal patients and not supplant such funding, the aggregate fee-for-service payments under the Medi-Cal program to hospitals for hospital services…shall not be less than the aggregate amounts that would have been paid for those services under [existing] rates and payment methodologies in effect….").[12]

Accordingly, Petitioners' first cause of action fails to state a claim as Petitioners fail to actually allege that Respondents violated any DSH or HQAF payment authorities.

---

[12] Petitioners also cite California Welfare & Institutions Code §§ 14169.56(e) and 14169.57 in support of their contentions regarding HQAF payments. Petition 45: 4-13. Both of these provisions concern increased "capitation payments to Medi-Cal managed health care plans," and are not applicable to any HQAF payments received by hospitals. Further, even if these provisions were applicable to Respondents, such authorities do not contain any requirements regarding how Respondents must spend the HQAF payments they receive.

### 3. Petitioners Have No Private Right of Action to Challenge CHS's Use of DSH or HQAF Payments.

Separate and apart from Petitioners' attempt to leverage authorities to allege restrictions that do not otherwise exist, no authority permits Petitioners to bring suit based on allegedly unlawful expenditures of DSH or HQAF payments. Indeed, none of the authorities Petitioners cite authorize a private right of action for mandamus or injunctive relief based on the conduct alleged here.

Under California law, a party may not simply say a statute has been violated to state a viable cause of action. *Julian v. Mission Community Hosp.*, 11 Cal. App. 5th 360, 378 (2017), as modified on denial of reh'g (May 23, 2017). A party's right to sue, if not specifically enumerated by statute, depends on whether the legislature has "manifested an intent to create such a private cause of action under the statute*." Lu v. Hawaiian Gardens Casino, Inc.*, 50 Cal.4th 592, 597 (2010) (quotation and citation omitted); *see also Noe v. Superior Court*, 237 Cal. App. 4th 316, 336 (2015). Legislative intent, if any, is revealed only through the language of the statute and its legislative history. *See Lu*, 50 Cal.4th at 592.

A statute's language may expressly provide for a private cause of action or refer to a remedy or means of enforcing its substantive provisions. *Noe*, *supra*, 237 Cal. App. 4th at 336; *Lu*, *supra*, 50 Cal.4th at 597. Thereafter, Courts may look to a statute's legislative history "for greater insight." *Id*. Ultimately, however, "[i]t is well settled that there is a private right of action to enforce a statute 'only if the statutory language or legislative history affirmatively indicates such an intent'." *Thurman v. Bayshore Transit Mgmt., Inc.* 203 Cal. App. 4th 1112, 1131-32 (2012) (emphasis added).

Here, Petitioners allege violations of California Welfare & Institutions Code §§ 14169.50, *et seq*., 14105.98, and 14166.12 in support of their first cause of action. None of these statutes include "clear, understandable, unmistakable terms" that "strongly and directly indicate that the Legislature intended to create a private cause of action" for the alleged violations. *See Lu*, *supra*, 50 Cal.4th at p. 597; *Noe*, *supra*, 237 Cal. App. 4th at p. 336.

- 12 -

1    First, Petitioners have not properly alleged any specific violations of Cal. Welf. & Inst.

2    Code § 14169.50, *et seq*., or the California Medi-Cal Reimbursement Improvement Act of 2013

3    (the "Act"). Nor can they, given that the Act does not describe duties imposed on hospitals when

4    spending federal and state grant money. Rather, the Act only sets forth the obligations of DHCS

5    and its director by prescribing how they are to impose a quality assurance fee to be paid by

6    hospitals—including but not limited to how to obtain all available federal funds to make

7    supplemental Medi-Cal payments to hospitals, calculate payments to public and private hospitals

8    using those funds, and determine a payment schedule.

9    For instance, Cal. Welf. & Inst. Code § 14169.53(b)(1) prescribes how "funds from the

10   proceeds of the fee assessed pursuant to this article" are to be used by DHCS and goes on to specify

11   the order of priority regarding its spending, with the first priority being "to pay for [DHCS's]

12   staffing and administrative costs directly attributable to implementing this article." Obviously,

13   individual hospitals are not paying DHCS's staffing and administrative costs, nor are they obligated

14   to. Moreover, subsections (d) and (e) give DHCS the right to modify the methodology to "meet the

15   requirements of federal law" and to "make adjustments, as necessary, to the amounts calculated

16   pursuant to [Cal. Welf. & Inst. Code §] 14169.52." Plain language clearly dictates that the rights

17   and obligations created by the Act are imposed upon DHCS—not Respondents.

18   Likewise, Cal. Welf. & Inst. Code §§ 14105.98(b) and 14166.12 dictate how the state and

19   department disburse funds, not how the hospital spends them. Cal. Welf. & Inst. Code § 14105.98

20   specifically outlines how to determine if a hospital is eligible for funding and payment adjustment

21   amounts. Cal. Welf. & Inst. Code § 14166.12 establishes the Private Hospital Supplemental Fund

22   and how it is to be used. These provisions clearly are directed towards the state and are intended to

23   bind DHCS and its director only. While Petitioners also reference the Medi-Cal Provider

24   Agreement,[13] such instrument expressly contemplates that any supposed violations of Chapters 7

25

26

27   _____

[13] Petition ¶ 6. The Petition references Form 6210 as the Medi-Cal Provider Agreement. DHCS Form 6210, however, is the Medi-Cal Physician Application/Agreement. DHCS Form 6208 is the Medi-Cal Provider Agreement. See DHCS, Medi-Cal Provider Agreement (DHCS 6208), available at: https://www.dhcs.ca.gov/services/ltc/Documents/DHCS6208.pdf.

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RESPONDENTS' MOTION TO DISMISS THE PETITION PURSUANT TO FED. R. CIV. P. 12(b)(6)

and 8 of the California Welfare and Institutions Code are to be resolved via a DHCS enforcement action:

> Provider further agrees that if it violates any of the provisions of Chapters 7 and 8 of the Welfare and Institutions Code…it may be subject to all sanctions or other remedies available to DHCS.[14]

Second, even if Petitioners could show violations of the Act, the only sections within the Act that provide for a private cause of action are clearly inapplicable. For instance, Cal. Welf. & Inst. Code § 14169.52(k) states, "[t]his subdivision creates a contractually enforceable promise on behalf of the state to use the proceeds of the quality assurance fee, including any federal matching funds, solely and exclusively for the purposes set forth in this article." This demonstrates an intent by the legislature to allow a private right of action against the state for violations of the Act. However, Petitioners neither identify this section as a basis for their cause of action, nor have they brought this case against DHCS.

California Welfare & Institutions Code § 14169.62, in turn, prescribes that the director "may correct any identified material and egregious errors in the data" and that the director's determination "shall not be subject to judicial review, except that a hospital may bring a writ of mandate." Again, Petitioners have not brought this action against DHCS, neither of Petitioners is a hospital, and this section is not elicited as a basis for Petitioners' claims. Finally, California Welfare & Institutions Code § 14169.69 establishes a protocol in "the event any hospital, or any party on behalf of the hospital, initiates a case or proceeding in any state or federal court in which the hospital seeks any relief of any sort whatsoever, including, but not limited to, monetary relief, injunctive relief, declaratory relief, or a writ, based in whole or in part on a contention that any or all of this article is unlawful and may not be lawfully implemented," which is not applicable here. None of the other provisions refer to or expressly create a cause of action.

Significantly, the fact the Legislature established private rights of action to remedy violations of these provisions, but not for violations of the provisions Petitioners allege, is a strong indication that Petitioners have no private right of action here. *See Rosales v. City of Los Angeles* 82 Cal. App. 4th 419, 427-428 (2000) (statutory scheme governing disclosure of police personnel

---

[14] *Id.*, Medi-Cal Provider Agreement § 2.

records did not create a private right of action where the Legislature did not include such a right in the statute but did create private rights of action in similar contexts in other statutes); *see also id.* at 428 ("[g]iven the comprehensiveness of the statutory scheme, the Legislature could have easily provided a remedy if one was intended"). No provision suggests an unmistakable legislative intent to create a private right of action for any of the alleged statutory violations, and thus Petitioners should not be permitted to unilaterally create one.

For this separate reason, Petitioners' first cause of action must be dismissed.

### 4. Cal. Civ. Proc. Code § 526a Does Not Provide a Mechanism for Petitioners to Assert Their First Cause of Action.

Additionally, to the extent Petitioners' first cause of action may be read to implicitly plead a taxpayer claim for a violation of California Civil Procedure Code § 526a, Petitioners do not, and cannot, allege facts to support such a claim.

Cal. Civ. Proc. Code § 526a allows taxpayers to "obtain a judgment, restraining and preventing any illegal expenditure of, … or injury to the … funds … of a local agency," but only against *"any officer, agent, or person acting on behalf of a local agency*." Cal. Civ. Proc. Code § 526a(a) (emphasis added.) "Local agency" is defined as "a city, town, county, or city and county, or a district, public authority, or any other political subdivision in the state." Cal. Civ. Proc. Code § 526a(d)(1).

As Petitioners are memberless nonprofit corporations that are not assessed taxes by Respondents, they are not taxpayers for purposes of Cal. Civ. Proc. Code § 526a. Further, while Petitioners fail to allege that Respondents are officers, agents, or persons acting on behalf of a "local agency," Petitioners have offered no legal basis to assert that, simply because Respondents receive and spend HQAF and DSH supplemental payments, they are somehow quasi-public agencies.

Further, even if Respondents could pursue a taxpayer claim per Cal. Civ. Proc. Code § 526a, Petitioners do not and cannot allege the necessary element of illegal or wasteful expenditure of public funds. Taxpayer suits brought under Cal. Civ. Proc. Code § 526a are limited to situations in which a party is seeking to prevent the waste or illegal expenditure of funds by a governmental body. *Waste Mgmt. of Alameda Cty., Inc. v. County of Alameda*, 79 Cal. App. 4th 1223, 1240

- 15 -

1    (2000). The purpose of Cal. Civ. Proc. Code § 526a is to permit a person to challenge wasteful

2    government action that would otherwise go unchallenged because of the standing requirement. *Id.*

3    (citation omitted). The taxpayer action must involve an actual or threatened expenditure of public

4    funds. *Id.* Allegations involving disagreements over discretionary conduct are insufficient. *Coshow*

5    *v. City of Escondido*, 132 Cal. App. 4th 687, 714 (2005) ("[A] taxpayer is not entitled to injunctive

6    relief under Code of Civil Procedure 526a where the real issue is a disagreement with the manner

7    in which government has chosen to address a problem….").

8         Here, neither the Medicaid program generally, nor the DSH or HQAF supplemental

9    payment programs specifically, limit or restrict how Respondents can use HQAF and DSH

10   payments. Indeed, the legislative history of California Welfare and Institutions Code §§ 14169.50,

11   *et seq.*, provides that HQAF program fees constitute supplemental reimbursement for past services,

12   not funds for future activities. *See* Committee Rep't on Sen. Bill 239 (noting that state provider fees

13   "allow increased Medicaid reimbursement to providers"); *see also*, *supra*, Section III(A)(2)

14   (discussing the various HQAF program authorities and materials that provide that HQAF

15   supplemental payments constitute supplement payments for services rendered).

16        In sum, Petitioners' allegations boil down to a challenge to Respondents' reasonable

17   judgment with respect to their use of limited resources. That Petitioners would prefer Respondents

18   to spend more resources at one hospital instead of another cannot form the basis of a taxpayer claim.

19   *Coshow*, 132 Cal. App. 4th at 714.

20        **B.  Petitioners' Second Cause of Action Fails to State a Claim.**

21        Petitioners' second cause of action, like their first, also fails. In connection with their second

22   cause of action, Petitioners allege that Respondents are in violation of Cal. Gov't Code § 11135

23   because their alleged use of DSH and HQAF payments to expand CCMC disparately impacts

24   unidentified low-income residents of Fresno. Petitioners seek injunctive relief forcing Respondents

25   to spend HQAF and DSH payments on the development and maintenance of CRMC. Petition

26   ¶¶ 111-120. Petitioners, however, have failed to state a claim for three independent reasons: (1) Cal.

27   Gov't Code § 11135 does not obligate Respondents to use HQAF or DSH payments to prioritize a

28

- 16 -

particular race; (2) Petitioners are not members of a Protected Class; and (3) Petitioners have not pled facts support their allegations of disparate impact on a Protected Class.

### 1. Cal. Gov't. Code § 11135 Does Not Require Respondents to Direct HQAF or DSH Supplemental Payments to "Black and Latino low-income patients."

As a preliminary matter, Petitioners read a requirement into California Government Code § 11135 that is simply contrary to the objectives of the Medicaid program. The Medicaid program exists to ensure "low-income populations" have access to quality healthcare services. Petition 9:18-20. However, Petitioners seek to redirect Respondents' HQAF and DSH payments "to improve access to care and the quality of that care for [] Black and Latino low-income patients." Petition 1:9-12. This demand that the Court effectively compel Respondents to use DSH and HQAF payments for "Black and Latino" residents fundamentally is inconsistent with the Medicaid Act, which is designed to improve access to care to all "low-income populations," regardless of their race.

In addition, Cal. Gov't Code § 11135(a) provides:

> No person in the State of California shall, on the basis of [a protected class] be unlawfully denied full and equal access to the benefits of . . . any program or activity that is . . . funded directly by the state, or receives any financial assistance from the state.

Here, Petitioners—two nonprofit organizations—do not allege that either Petitioner has been unlawfully denied full and equal access to healthcare services at any of CHS's facilities on the basis of their status as a member of a Protected Class. At most, Petitioners allege that CCMC and CRMC are different hospitals (indeed they are, as CRMC is home to the only Level I Trauma Center between Los Angeles and Sacramento), and the cities in which such hospitals are located have populations with different economic and racial compositions. These facts, standing alone, are not sufficient to state a claim that any person has been "denied full and equal access to" benefits based upon their status as a member of a protected class.

### 2. Petitioners Are Not in a Protected Class.

Apart from the fact that Petitioners' contentions do not actually align with Cal. Gov't Code § 11135, Petitioners' second cause of action also requires Petitioners to be in a protected

class, which they are not. Cal. Gov't Code § 11135 provides that "[n]o person" should be "unlawfully subject to discrimination" on the basis of enumerated protected classifications: sex, race, color, religion, ancestry, national origin, ethnic group identification, age, mental disability, physical disability, medical condition, genetic information, marital status, or sexual orientation. To establish a prima facie case under a disparate impact theory, Petitioners must show "the defendant's facially neutral practice causes a disproportionate adverse impact on a protected class."[15] *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 519 (9th Cir. 2011) (emphasis added).

Cal. Gov't Code § 11135 requires that a plaintiff must be a victim of discrimination, which inherently requires some form of direct harm or injury. *Id.*; *see Blumhorst v. Jewish Family Services of Los Angeles* ("*Blumhorst*")*,* 126 Cal. App. 4th 993 (2005)*.* Without alleging such direct harm or injury, a party may not assert a claim under Cal. Gov't Code § 11135. For example, in *Blumhorst*, the plaintiff (a man claiming to be a battered husband) filed a complaint for an injunction against certain domestic violence shelters based on alleged violations of Cal. Gov't Code § 11135. In support of his claim, the plaintiff alleged that the shelters unlawfully refused to provide him with shelter because he was a man. 126 Cal.App.4th at 998-999. But because the plaintiff failed to allege that he asked for shelter and was denied when he suffered domestic violence, the trial court sustained the defendant shelters' demurrer without leave to amend and granted judgment on the pleadings. *Id.* The court of appeal affirmed, holding that dismissal was warranted because the plaintiff had not alleged that he was a victim of any alleged unlawful, discriminatory practices. *Id.* at 999-1003; *see also Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1100 (S.D. Cal. 2017) (granting the defendant hospital's motion to dismiss with respect to injunctive and declaratory relief sought under Cal. Gov't Code § 11135 because the plaintiff had not alleged how an injunction or declaratory relief would redress the plaintiff's alleged injuries).

Here, Petitioners, non-profit community organizations, purport to represent low-income and indigent residents of Fresno County who utilize CRMC. *See*, *e.g.*, Petition ¶¶ 52, 73-74, 77, 112,

---

[15] The legislative history of Cal. Gov't Code § 11135, as clarified by amendments in 1999 and 2001, indicates that the statute was intended to allow victims of unlawful discrimination to enforce the prohibition against discrimination through an action for equitable relief. *Blumhorst v. Jewish Family Services of Los Angeles*, 126 Cal. App. 4th 993 (2005).

114, 117-118. While income and insurance status are not protected categories under Cal. Gov't Code § 11135, Petitioners themselves also are not members of a protected class, have not alleged direct harm or injury, and may not assert associational standing under Cal. Gov't Code § 11135. *See Blumhorst*, 126 Cal. App. 4th at 1003-04 (holding that Cal. Gov't Code § 11135 does not provide for standing by a party who is not personally injured). Accordingly, the Petition fails to state a claim under Cal. Gov't Code § 11135.

### 3. Petitioners Have Not Pled Facts Supporting a Disparate Impact on a Protected Class.

Even if Petitioners could advance claims on behalf of Black and Latino residents of Fresno County who rely on CRMC, they have not plausibly pleaded that Respondents' spending decisions have an impermissible "disparate impact" on such residents.

To demonstrate disproportionate harm or impact in support of a claim of disparate impact discrimination, a plaintiff "must employ an appropriate comparative measure." *Villafana v. County of San Diego*, 57 Cal. App. 5th 1012, 1018 (2020). An appropriate measure "must…take into account the correct population base and its racial makeup." *Id*. (*quoting Darensburg*, 636 F.3d at 520). "'[T]he appropriate inquiry is into the impact on the total group to which a policy or decision applies,'" as compared to the impact on a protected group. *Id*. (*quoting Hallmark Developers, Inc. Fulton County*, 466 F.3d 1276, 1286 (11th Cir. 2006)) [emphasis added]. In other words, "'the basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy.'" *Darensburg*, 636 F.3d at 519-520.

Here, contrary to Petitioners' contention, the relevant comparison for purposes of Petitioners' second cause of action would be every person in the geographic or regional sphere of CRMC. Aside from asserting that there are "high concentrations of Black and Latino residents that primarily feed [CRMC]" (Petition ¶ 78), Petitioners have not alleged that, within this population, there has been any disparate impact. Rather, Petitioners argue that "Respondents disinvestment in [CRMC] in order to fund massive investments in [CCMC] has made it more difficult for the much larger number of Black and Latino patients that treat at [CRMC] to access quality care…." Petition ¶ 79. While Respondents disagree generally with Petitioners' opinions of CRMC—Petitioners have

1    not alleged that any patient who visits CRMC is in a different circumstance from any other patient

2    who visits CRMC.

3         The court in *Villafana* applied these principles in upholding dismissal of plaintiffs'

4    complaint without leave to amend to challenges to government-funded policies under Cal. Gov't

5    Code § 11135 and/or its "disparate impact regulation" for the plaintiffs' failures to allege

6    appropriate comparators. There, the plaintiffs challenged a county requirement that applicants for

7    public assistance under the state CalWORKS program participate in an unannounced home visit by

8    a state officer. 57 Cal. App. 5th at 1015. The plaintiffs alleged that the policy disparately impacted

9    people of color because it stigmatized and traumatized applicants, who were disproportionately

10   Latino, Black, and female as compared to the general population of San Diego County. *Id*. at 1015-

11   17. The court rejected the plaintiffs' use of the general population as a relevant comparator group.

12   The appropriate comparison, the court explained, was "between groups to whom the facially neutral

13   policy has been or can be applied." *Id*. at 1018. The plaintiffs, however, failed to allege that minority

14   or female applicants "suffer harsher impacts than other groups to whom the [home visit] practice

15   is applied." *Id*. at 1020. "Because all applicants are subject to the home visits," the court concluded,

16   "there is no viable disparate impact claim." *Id*.

17        Similarly, in *Carter v. CB Richard Ellis, Inc.*, 122 Cal. App. 4th 1313 (2004), the plaintiff

18   alleged that a company-wide administrative reorganization had caused a disparate impact on

19   women employees and those over age of 40, because it "demoted administrative managers, all but

20   one of whom were women, and about half of whom were over 40." *Id*. at 1321. However, the court

21   found the plaintiff failed to compare this alleged adverse impact on administrative managers with

22   the demographics and impact of the reorganization on all the company's employees. *Id*. at 1325-

23   26. As the court observed, disparate impact is not proved merely because all members of a subgroup

24   adversely affected by a policy "are also members of a protected group." *Id*. at 1326. Because the

25   plaintiff had failed to offer any evidence to compare the alleged disparate impact of the

26   reorganization against the impact on others affected by it, the plaintiff failed to establish a disparate

27   impact claim "[a]s a matter of law." *Id*.

28

1   The court in *Carter* also criticized the "erroneous premise" plaintiffs' use of a non-protected

2   subgroup—administrative managers—as a proxy for protected groups of women and persons over

3   40. *Id.* at 1322. As the court noted, "the law does not prohibit discrimination against administrative

4   managers," and all the plaintiffs' evidence showed was a disparate impact against administrative

5   managers. *Id.*

6   Petitioners here similarly seek to use low-income residents of Fresno County as a proxy for

7   Black and Latino residents. But Petitioners' allegations that Respondents' business decisions have

8   adversely impacted a segment of the population (*i.e.*, low-income residents of Fresno County) that

9   includes Black or Latino residents are insufficient to allege a disparate impact on a protected group.

10  *See Carter*, 122 Cal. App. 4th at 1321-23. Rather, Petitioners must show that Respondents' actions

11  adversely impacted Black and Latino low-income residents as compared to non-Black and non-

12  Latino low income residents. Petitioners have made no such showing.

13  Courts have explicitly rejected Petitioners' reasoning in several similarly situated cases. For

14  example, in *In re County Inmate Telephone Service Cases*, 48 Cal. App. 5th 354, 362 (2020), a

15  court upheld dismissal of several plaintiffs' cause of action under Cal. Gov't Code § 11135 without

16  leave to amend because plaintiffs failed to use a comparator group that only included the affected

17  population. Therein, the plaintiffs alleged racial discrimination in connection with the telephone

18  charges they paid to use the inmate calling system, primarily relying on the fact that inmates and

19  their families were disproportionately Black and Latino, compared to the overall population of the

20  county. *Id.* at 368. However, the "total group" to whom defendants provided telephone services

21  was the inmate population, not the county at large. *Id.*; *Darensburg*, 636 F.3d at 519-520. Without

22  any allegation that Black or Latino inmates and their families were treated differently from inmates

23  and their families who were not members of those groups, the claim was not viable. *Id.*

24  *Darensburg* presents a useful example as well. There, a district court erred by relying on a

25  faulty syllogism related to transportation in San Francisco: (1) a greater percentage of bus riders

26  than rail riders were minorities; (2) fewer bus expansion projects than rail expansion projects were

27  included in a transit plan, and bus projects received a lesser percentage of requested funding than

28  did rail projects; (3) therefore, minorities were adversely affected. *Darensburg*, 636 F.3d at 520-

521. The appellate court overturned the district court, finding that plaintiffs failed to establish a prima facie case of disparate impact. *Id*. Simply because minority groups represented a greater majority of bus riders as opposed to rail riders, the rejection of a particular new bus expansion project in favor of a new rail expansion project did not have an adverse impact on minority groups. *Id*.

Here, Petitioners attempt to apply the same flawed reasoning as the plaintiffs is *County Inmate* and *Darensburg*. Petitioners allege that because the zip codes most heavily served by CRMC have high concentrations of Latino and Black residents, it must be true that minority groups are disproportionately affected by Respondents' decisions. First, as established in *Carter*, disparate impact is not proved merely because all or most members of a subgroup adversely affected by a policy "are also members of a protected group." *Carter*, *supra*, 122 Cal. App. 4th at 1326. Second, the proper comparative group is the total group to which a policy or decision applies. *Darensburg*, 636 F.3d at 519-520. Here, Petitioners do not allege that members of any demographic are treated differently at CRMC or CCMC than any other demographic. Nor can they, as every patient that visits each respective hospital is equally affected by the decisions made by Respondents with respect to such hospitals.

In sum, Petitioners have not alleged that Respondents' business decisions disparately impact a protected group. Therefore, Petitioners' second cause of action also necessarily fails.

## IV.    CONCLUSION

Respondents value Petitioners' dedication to those most in need of a voice. Indeed, before this lawsuit was filed, the Parties discussed how they might meaningfully work together to best serve Petitioners' constituents, but Respondents simply could not comply with Petitioners' unreasonable demands. And while Respondents remain deeply committed to their mission to better the lives of <u>all</u> those served by CHS, the authorities cited by Petitioners simply do not provide a means for Petitioners to dictate how CHS should use its resources. To hold otherwise would create a precedent allowing any individual or entity to proceed with litigation against a hospital or health system simply because the individual or entity believes the hospital should have different priorities

1 | and should spend its resources in a different way. Such a holding would result in paralyzing disputes

2 | that would only serve to further constrain hospital resources.

3 |       Accordingly, for the reasons set forth above, Petitioners have failed to state a claim and this

4 | Court should dismiss their Petition in its entirety, with prejudice.

5 |

6 | Dated: November 12, 2024                Respectfully submitted,

7 |

8 |                        NIXON PEABODY LLP

9 |

10 |                        By: _____

11 |                           Jonah D. Retzinger

12 |                         *Attorney for Respondents*<br>COMMUNITY HOSPITALS OF

13 |                         CENTRAL CALIFORNIA and FRESNO<br>COMMUNITY HOSPITAL AND

14 |                         MEDICAL CENTER d/b/a<br>COMMUNITY HEALTH SYSTEM

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RESPONDENTS' MOTION TO
DISMISS THE PETITION PURSUANT TO FED. R. CIV. P. 12(b)(6)