Patience Milrod (SBN 77466)
Amelia Arámbula (SBN 210291), of counsel
Law Office of Patience Milrod
985 North Van Ness Avenue
Fresno, California 93728
Telephone:     (559) 246-7239
Email: pm@patiencemilrod.com
          amyarambula@patiencemilrod.com

Attorneys for Petitioners
CULTIVA LA SALUD and FRESNO
BUILDING HEALTHY COMMUNITIES

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

CULTIVA LA SALUD, a nonprofit
community benefit organization; and
FRESNO BUILDING HEALTHY
COMMUNITIES, a nonprofit community
benefit organization,

                    Petitioners,

          v.

COMMUNITY HOSPITALS OF
CENTRAL CALIFORNIA, a California
nonprofit public benefit corporation;
FRESNO COMMUNITY HOSPITAL
AND MEDICAL CENTER, dba
COMMUNITY HEALTH SYSTEM, a
California nonprofit public benefit
corporation; et al,

                    Respondents.

No.  1:24-cv-01065-JLT-EPG

**PETITIONERS' CULTIVA LA SALUD
and FRESNO BUILDING HEALTHY
COMMUNITIES' OPPOSITION TO
RESPONDENTS' MOTION
TO DISMISS THE PETITION
PURSUANT TO FED. R. CIV. P. 12(b)(6)**

District Judge: Hon. Jennifer L. Thurston
Magistrate Judge: Hon. Erica P. Grosjean

No hearing date

///

///

///

///

# Table of Contents

I.   Respondents' motion to dismiss requires this case be remanded promptly to the Fresno County Superior Court. ................................................................................................... 1

II.   The Petition meets federal pleading standards. ...................................................................... 2

III.   Petitioners have adequately pled that principles of statutory construction require a finding that pertinent statutes restrict Respondents' use of Supplemental Medi-Cal funding to Medi-Cal health services for eligible patients. ................................................................................. 3

A.   This Court will apply California's canons of statutory interpretation. .................................. 5

B.   The plain language of the statutes restricts Respondents' use of Supplemental Medi-Cal funding to health services for indigent patients. .............................................................. 7

IV.   The Court's lack of jurisdiction over Petitioners' declaratory relief claim requires remand to the state court. ................................................................................................................. 11

V.   Petition satisfies Rule 8(a)'s requirements for pleading a right to relief under California Government Code § 11135. ...................................................................................................... 13

A.   Petitioners have alleged facts which if proved will show that Respondents' spending decisions disproportionately and unlawfully adversely affect their Black and Latino patients..... 13

B.   Petitioners have standing to bring this action, and regulations implementing § 11135 are in accord. ...................................................................................................................... 15

C.   The Petition pleads facts supporting a disparate impact on protected classes within the meaning of Government Code § 11135. ............................................................................ 17

VI.   CONCLUSION ................................................................................................................ 21

1

**Table of Authorities**

2

**CASES**

3

*Alameda County Land Use Assn. v. City of Hayward*, 38 Cal.App.4th 1716, 45
Cal.Rptr.2d 752 (1995) .................................................................................... 12

4

*ASARCO Inc. v. Kadish*, 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) .................... 12

*Ashcroft v. Iqbal,* 556 US 662, 129 S.Ct. 1937 (2009) ........................................... 2, 3

5

*Blumhorst v. Jewish Family Services of Los Angeles,* 126 Cal. App. 4th 993 (2005) ............... 17

6

*City of Reno v. Netflix, Inc.*, 52 F.4th 874 (9th Cir. 2022) ........................................ 12

7

*Committee To Defend Reproductive Rights v. Myers*, 29 Cal. 3d 252, 625 P.2d 779
(1981) ........................................................................................................ 7

8

*Common Cause v. Bd. of Supervisors*, 49 Cal.3d 432, 777 P.2d 610 (1989) ............................ 17

9

*CPR for Skid Row v. City of Los Angeles,* 779 F.3d 1098 (9th Cir. 2015) ............................. 6

*Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511 (9th Cir. 2011).................................. 19

10

*Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018)..................................... 12

11

*Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.,* 764 F.2d 619 (9th Cir.
1985) .......................................................................................................... 3

12

*Guthrie v. Transamerica Life Ins. Co.*, 561 F. Supp. 3d 869 (N.D. Cal. 2021) ........................ 12

13

*Halbert's Lumber, Inc. v. Lucky Stores, Inc.,* 6 Cal.App.4th 1233, 8 Cal.Rptr.2d
298 (1992) .................................................................................................... 6

14

*In re Claudia E.*, 163 Cal. App. 4th 627, 77 Cal. Rptr. 3d 722 (2008)................................ 11

15

*Los Molinos Mut. Water Co. v. Ekdahl*, No. 2:21-CV-01961-DAD-DMC, 2024
WL 2302365 (E.D. Cal. May 21, 2024)..................................................................... 12

16

*MacIsaac v. Waste Management Collection and Recycling, Inc.,* 134 Cal.App.4th
1076, 36 Cal.Rptr.3d 650 (2005) .......................................................................... 7

17

*McGary v. City of Portland*, 386 F3d 1259 (9th Cir. 2004) ............................................ 3

18

*Monterey Coastkeeper v. Cent. Coast Reg'l Water Quality Control Bd.*, 76 Cal.
App. 5th 1, 290 Cal. Rptr. 3d 787 (2022) ............................................................... 11

19

*OSU Student All. v. Ray*, 699 F.3d 1053 (9th Cir. 2012 ............................................... 3

20

*People v. Cornett,* 53 Cal.4th 1261, 139 Cal.Rptr.3d 837 (2012).................................... 6

21

*Polo v. Innoventions Int'l, LLC*, 833 F.3d 1193 (9th Cir. 2016)..................................... 12

22

*Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090 (S.D. Cal.
2017) ........................................................................................................ 17

23

*Samuels v. Mackell*, 401 U.S. 66, 91 S. Ct. 764, 27 L. Ed. 2d 688 (1971)),........................ 12

24

*Sheppard v. David Evans & Assoc.*, 694 F.3d 1045 (9th Cir. 2012) .................................... 2

25

*Villafana v. County of San Diego,* 57 Cal. App. 5th 1012 (2020) ............................ 17, 19, 20

*Wasatch Property Management v. Degrate,* 35 Cal.4th 1111, 29 Cal.Rptr.3d 262
(2005)........................................................................................................ 6

26

*Younger v. Superior Court*, 21 Cal.3d 102, 145 Cal.Rptr. 674 (1978) ................................. 7

27

28

**STATUTES**

California Code of Civil Procedure § 526a .................................................................. 12

California Government Code § 11135 ................................................................. passim

California Welfare & Institutions Code § 14000 ................................... 7, 8, 15, 20

California Welfare & Institutions Code § 14105.98 ............................... 9, 10, 16

California Welfare & Institutions Code § 14166, et seq ..................... 5, 9, 10, 16

California Welfare & Institutions Code § 14166.11 ......................................... 9

California Welfare & Institutions Code § 14166.12 ................................... 9, 16

California Welfare & Institutions Code § 14169.50, et. seq ........................... 8

California Welfare & Institutions Code § 14169.53 ...................................... 8, 9

California Welfare & Institutions Code § 14169.56 ......................................... 9

California Welfare & Institutions Code § 14169.57 ......................................... 9

California Welfare & Institutions Code §§ 14169.50, et seq ....................... 6, 16

Medi-Cal Hospital/Uninsured Care Demonstration Project Act (2005) .......... 5, 9

Private DSH Hospital Replacement Program ................................................. 5, 9

Private Hospital Supplemental Fund program ............................................... 5, 9

**OTHER AUTHORITIES**

Patient Characteristics by County & Facility, 2022. California Department of
    Healthcare Access and Information data ................................................. 14

Proposition 52 (2016) ....................................................................................... 6, 8

Proposition 52 Secretary of State Official Voter Information Guide,
    *https://vigarchive.sos.ca.gov/2016/general/en/quick-reference-guide/52.htm* ...... 5

Senate Bill 239 (2013) ........................................................................................... 5

State Plan Amendment approval letter dated February 25, 2020 ...................... 8

State Plan Amendment Attachment 4.19-A, Appendix 2,
    https://www.dhcs.ca.gov/formsandpubs/laws/Documents/Appendix%202%20t
    o%20Attachment%204.19-A.pdf, p. 29N. ............................................. 10

**REGULATIONS**

2 California Code of Regulations § 14000 ....................................................... 16

2 California Code of Regulations § 14020 ......................................... 15, 16, 17, 20

2 California Code of Regulations § 14027 ................................................... 15, 16

2 California Code of Regulations § 14029 ................................................... 19, 21

2 California Code of Regulations § 14050 ....................................................... 17

**RULES**

Federal Rules of Civil Procedure, Rule 12(b)(6) ............................................... 3

Federal Rules of Civil Procedure, Rule 8(a) ............................................. 2, 13, 15

iii

**TREATISES**

*2005 Medi-Cal Hospital Waiver*, California Health Care Foundation Issue Brief
April 2006, https://www.chcf.org/wp-content/uploads/2017/12/PDF-
ExaminingThe2005MediCalWaiver.pdf ................................................................... 9

Wright & A. Miller, *Federal Practice and Procedure:* Civil § 1357 (1969) ............................. 3

**CONSTITUTIONAL PROVISIONS**

California Constitution, Article. XVI, § 3.5 ................................................................. 8

## I.  Respondents' motion to dismiss requires this case be remanded promptly to the Fresno County Superior Court.

Respondents claimed in their Notice of Removal of Action (Doc.1) that federal law was central to all issues in this matter, asserting among other claims that:

> Given Petitioners' express allegations and request for relief, the Court will be required to independently assess whether Respondents violated federal laws and regulations and whether Petitioners are entitled to the interpretation of federal law they seek.  Both causes of action, therefore, *depend* on the resolution of *substantial, disputed, federal questions* that have potentially national implications.  (Doc.1, p.7:12-17 [emphasis added].)

In their opposition to Petitioners' motion to remand, Respondents doubled down:  "[i]t is axiomatic that the Court must rely on federal law to resolve Petitioners' claims,"  and "the resolution of the *substantial federal questions* raised in the Petition will impact every health care provider in the nation that receives Medicaid funding under the programs at issue.  Therefore, a federal court is the appropriate forum to resolve this dispute of national importance." (Doc.18, p.2:6-7 and 16-19 [emphasis added].)

However, even the Respondents' defense of removal (Doc.18) manages to reference, and that without explication, only a single federal statute and some regulations whose interpretation, they say, is essential, unavoidable, and determinative to this case.  Tellingly, the instant motion to dismiss appropriately focuses its argument on the California state statutes on which each of Petitioners' claims actually rely.  And the "substantial federal questions" about which Respondents were so concerned?  They're relegated to a few references in the Background section[1] of Respondents' motion (Doc.25-1, p. 5, *passim*), and one "see also" cite (pp.9:28-10:4),

---

[1] Respondents cite several federal cases in this Background section, in which hospital plaintiffs challenge the interpretation of federal DSH statutes and regulations governing hospital eligibility or the methodology for calculating DSH awards.  The remaining case disputes DHCS' recoupment of past due HQAF fees from a bankrupt hospital.  We need not distinguish these, as they do not pertain to the state statutes of interest in this matter.

presumably pertinent in some unexplained way to the immediately-preceding multiple references to California's Welfare and Institutions Code.

In their dismissal motion, Respondents devote by far the majority of their argument to interpretation and application of California statutes.  While Petitioners disagree with the substance of most of what they have to say, Petitioners do agree that California law is the arena in which this case must be considered and decided.  Given the inordinate delays in civil litigation necessitated by the ongoing judicial resource emergency in this District, it is effectively a denial of access to the courts to allow Respondents to push the merits of this case into the indefinite future[2] with the featherweight claim to federal jurisdiction they have proffered—apparently not even seriously, as their dismissal briefing shows.

## II.  The Petition meets federal pleading standards.

Federal Rules of Civil Procedure, Rule 8(a)(2) and (3), requires that the Petition contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and "a demand for the relief sought."   The Petition meets that standard.

A complaint must contain sufficient *factual* allegations to show a "plausible" claim for relief.  *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1048 (9th Cir. 2012).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal,* 556 US 662, 678, 129 S.Ct. 1937 (2009).  *Iqbal* requires a two-prong analysis:  first, conclusory allegations are disregarded; second, "[w]hen there are well-pleaded factual allegations, a court

---

[2] See, Doc. 27, Minute Order of November 15, 2024, in which this Court advises that "approximately 100 regular civil motions remain under submission before the undersigned.  As a result, it is likely to be six <u>or more</u> months until the motion(s) in this matter is resolved."  [Emphasis in original.]  In light of Magistrate Judge Grosjean's Minute Order of November 13, 2024 (Doc. 26), vacating the January 2025 scheduling conference, continued and unwarranted federal management of this case will unreasonably delay a substantive response to the Petition, and discovery, for many unnecessary months or years.

should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal, supra,* 556 US at 679, 129 S.Ct. at 1950.  In reviewing a dismissal under Rule 12(b)(6), the Court will accept the well-pleaded factual allegations of the complaint as true and construe them in the light most favorable to Petitioners.  *OSU Student All. v. Ray*, 699 F.3d 1053, 1061 (9th Cir. 2012.  Where the claim is plausible—meaning something more than "a sheer possibility," but less than a probability—the plaintiff's failure to prove the case on the pleadings does not warrant dismissal.  *OSU Student All. v. Ray, supra*, 699 F.3d at 1078.

The within matter raises issues of California law requiring statutory interpretation and for which there is no California precedent on point.  Rule 12(b)(6) dismissals are "especially disfavored" where the complaint sets forth a novel legal theory "that can best be assessed after factual development." *McGary v. City of Portland*, 386 F3d 1259, 1270 (9th Cir. 2004).  As the Ninth Circuit has observed, "'[t]he court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions.' " *Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.,* 764 F.2d 619, 623 (9th Cir. 1985) (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure:* Civil § 1357, at 601–03 (1969)).

Nevertheless, Petitioners respectfully request that if the Court finds any ground for dismissal, it allow Petitioners leave to amend their Petition to resolve the deficiency.

### III. Petitioners have adequately pled that principles of statutory construction require a finding that pertinent statutes restrict Respondents' use of Supplemental Medi-Cal funding to Medi-Cal health services for eligible patients.

When challenged about how Respondents had expended Supplemental Medi-Cal funding delivered to CRMC, CEO Craig Castro declared that all monies that come into Community

Health System (of which at least 70% are public dollars) are property of the Respondent corporation as a whole:  "The money is viewed as a system asset, and we're looking to serve the region.  The money that came from the government was in order to support the patients we care for as a system, and we used it in the best way, as a system, to get the most capacity."  Petition, p.23, ¶51.

Once Petitioners have discovery[3], our forensic accountant will provide the Court a fully accurate idea of what "the most capacity" really means to Respondents.  Meantime, we do know that Respondents' guiding inspiration for renovations to Clovis' suburban hospital—which serves so few Medi-Cal patients it cannot qualify for DSH funding—were upscale hotels like the Four Seasons:  CHS's architect reports that "The client wanted a sense of luxury but not opulence."  Petition, ¶ 48, p. 22.  This is no way to spend public dollars intended for indigent medical care.

Petitioners expect to prove that in early 2018, Respondents' board of trustees[4] were informed that CHS had been awarded hundreds of millions of dollars in net HQAF funding.  As of March of 2018, the board was facing multiple concerns about its downtown hospital:  the State's looming requirement for seismic upgrades to Fresno CRMC's antiquated patient towers; the bottlenecks in CRMC's Emergency Department; the need to maintain CRMC's level of transfer patients (to the Trauma Center or NICU, for example) and patients with high-end private health coverage; and the extraordinary needs of the patient populations reliant on that downtown Fresno hospital for care.

---

[3] Asserting CHS's private non-profit status as a basis for non-disclosure, Respondents repeatedly rejected Petitioners' requests for information about how CHS has expended Supplemental Medi-Cal funding over the past fifteen years.

[4] In their dismissal motion (p.2, fn.4), Respondents complain that the Petition "lumps together" their various incarnations and entities, and does not make specific-conduct allegations against each of them. However, Respondents behave as a unitary entity (Petition, pp.6-8, ¶¶ 7-10), with a single board of trustees and a single set of corporate officers who govern all operations.  Petitioners have named Does (Petition, p.9, ¶13), and reserve the right to amend the Petition to name specific bad actors as discovery makes it possible to assign liability.

In the end, the board decided there would not be enough money to pay for both the needed upgrades to Fresno CRMC and the extensive remodels and upgrades to Clovis CMC they aspired to complete.  So they chose to spend the newly-awarded HQAF funding on the Clovis projects, leaving progress toward meeting the downtown hospital's needs dependent on the balance sheet, the bond market, and *future* Supplemental Medi-Cal funding.  The evidence will show that this was not a departure from CHS standard operating procedure:  at the time of this consequential decision, for years the board had already been directing supplemental Medi-Cal funding away from the downtown hospital, where most indigent patients are served, and out to new construction, new equipment, and remodeling in Clovis.

CHS's lawyers echo Mr. Castro:  "Like DSH payments, there are no authorities that restrict, condition, or direct the use of HQAF payments upon receipt."  Doc. 25-1, pp.6:23-7:2[5].  Apart from their ballot-argument proffer—which works against them under rudimentary principles of statutory construction, since the voters rejected the free-for-all statutory reading the Respondents urge—CHS offers no statutory language, and no statutory construction, that even renders ambiguous the plain language of the statutes in question here.

### A.  This Court will apply California's canons of statutory interpretation.

This Court's determination of the legislative intent behind California's Supplemental Medi-Cal payment programs is a matter of first impression:  in creating California's Supplemental Medi-Cal funding streams[6], did the legislature intend to restrict use of that funding

---

[5] In support of this surprising assertion, Respondents cite a surprising source:  the ballot *argument* against Proposition 52 in the Secretary of State's online Official Voter Information Guide.  The Legislative Counsel's Summary more accurately describes the program's *purpose*:  "Extends indefinitely an existing statute that imposes fees on hospitals *to fund Medi-Cal health care services, care for uninsured patients, and children's health coverage*."  *https://vigarchive.sos.ca.gov/2016/general/en/quick-reference-guide/52.htm*. [emphasis added].

[6] Private DSH and Private Hospital Supplemental Fund programs were enacted under the Medi-Cal Hospital/Uninsured Care Demonstration Project Act in 2005, W&I Code §§ 14166, *et seq.*  HQAF was first enacted in 2009; the fourth iteration of HQAF legislation, SB 239 (2013), codified at W&I Code §§

to care for the indigent?

Petitioners maintain that Supplemental Medi-Cal funding is a mechanism to incentivize hospitals to ensure the availability of essential services for indigent patients; the operative qualification is the level of care for low-income persons. The California Legislature enacted these programs to balance the inequities which exist for hospitals that treat a disproportionate number of indigent patients, to ensure their continued operation for the benefit of indigent patients who have few other health care alternatives.

To construe California statutes, this Court will apply California's canons of statutory interpretation. *CPR for Skid Row v. City of Los Angeles,* 779 F.3d 1098, 1104 (9th Cir. 2015). Under California law, the "fundamental task" of statutory interpretation is "to determine the Legislature's intent so as to effectuate the law's purpose." *People v. Cornett,* 53 Cal.4th 1261, 1265, 139 Cal.Rptr.3d 837, 274 P.3d 456 (2012) (internal citations and quotation marks omitted).

The California Supreme Court summarized California's approach in *Wasatch Property Management v. Degrate,* 35 Cal.4th 1111, 29 Cal.Rptr.3d 262 (2005): "We examine the language first, as it is the language of the statute itself that has 'successfully braved the legislative gauntlet.' [Citation.] 'It is that [statutory] language which has been lobbied for, lobbied against, studied, proposed, drafted, restudied, redrafted, voted on in committee, amended, reamended, analyzed, reanalyzed, voted on by two houses of the Legislature, sent to a conference committee, and, after perhaps more lobbying, debate and analysis, finally signed "into law" by the Governor.' [Citation.]" *Ibid.,* 35 Cal.4th at 1117-1118.

This Court's first task then, is " giving the words their ordinary, everyday meaning." *Halbert's Lumber, Inc. v. Lucky Stores, Inc.,* 6 Cal.App.4th 1233, 1238, 8 Cal.Rptr.2d 298 (1992). If the "statutory language is clear and unambiguous, the court's task is at an end, for

---

14169.50, *et seq*, which was extended indefinitely by Proposition 52 (2016).

there is no need for judicial construction; in such a case, there is nothing for the court to interpret or construe*." MacIsaac v. Waste Management Collection and Recycling, Inc.,* 134 Cal.App.4th 1076, 36 Cal.Rptr.3d 650, 655 (2005).  Interpreting courts must also take care that "language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." *Younger v. Superior Court,* 21 Cal.3d 102, 113, 145 Cal.Rptr. 674 (1978) [internal citations omitted].

### B.  The plain language of the statutes restricts Respondents' use of Supplemental Medi-Cal funding to health services for indigent patients.

Each of the statutes on which Petitioners rely here for relief is part of a single overarching statutory scheme whose purpose the California Supreme Court identified decades ago: "Welfare and Institutions Code section 14000 declares that '[t]he purpose [of the Medi-Cal program] is to afford health care and related remedial or preventive services to recipients of public assistance and to medically indigent aged and other persons ...'; thus, the program's primary objective is to alleviate the hardship and suffering incurred by those who cannot afford needed medical care by enabling them to obtain such medical treatment." *Committee To Defend Reproductive Rights v. Myers*, 29 Cal. 3d 252, 271-272, 625 P.2d 779 (1981).

Respondents propose however that this overarching purpose evaporates at the moment the State delivers the money to the hospitals.  Doc. 25-1, pp.6:8-11, 6:23-7:2, 9:21-10:6, 11:15-21.  Their theory is apparently that once some services have been provided to Medi-Cal eligible patients, any Medi-Cal funding supplied to fill the gap between cost and compensation is just "reimbursement," and thereby somehow laundered of its public purpose.  Such an interpretation "would result in absurd consequences which the Legislature did not intend." *Younger v. Superior Court, supra,* 21 Cal.3d at 113, 145 Cal.Rptr. 674, 577 P.2d 1014 (1978) .  Since Medi-Cal payments do not cover the full cost of providing care for indigent patients, a hospital that handles such payments as unrestricted could theoretically spend them on anything at all—for example a

7

million-dollar chandelier, and other luxury hotel-type amenities at its Clovis facility—whether or not such an expenditure actually "affords health care and related remedial or preventive services to recipients of public assistance and to medically indigent aged and other persons." California Welfare & Institutions Code § 14000. Such "unrestricted" uses of public dollars intended for indigent patient care are patently inconsistent with the public policy and legislative intent behind the funding grants: the only way hospitals can even *afford* to comply with the legislative goals behind California's statutory scheme is if they reinvest the Medi-Cal funding they receive into care for the patients who are the intended beneficiaries of that funding.[7]

The more logical interpretation of the statute is the one the statutory language itself denotes, and which the Petition asserts at ¶¶ 17-32: providers must use Medi-Cal funding to fund medical care for Medi-Cal eligible patients. This statutory purpose is not uniformly framed across every enactment, but the goals are clearly the same:

- to enable individuals to secure health care in the same manner as the public generally and without discrimination or segregation based on economic disability. California Welfare & Institutions (W&I) Code § 14000 (Medi-Cal generally);

- to ensure that the state uses these funds for the intended purpose of supporting hospital care to Medi-Cal patients and to help pay for health care for low-income children. Proposition 52, codifying W&I Code § 14169.50, *et seq.* into the California Constitution, as Art. XVI, § 3.5, § 2 (HQAF);

- to increase indigent access to medical care by funding hospitals through a hospital quality assurance fee, recognizing "the essential role that hospitals play in serving the state's Medi-Cal beneficiaries." W&I Code § 14169.50(a), (b)[8] (HQAF);

---

[7] Respondents propose a similar absurd-outcome interpretation when they suggest that W&I Code § 14169.53(b)(1) applies only to the California Department of Health Care services, and that its spending restrictions do not extend to recipient hospitals. Doc.25-1, 11:3-14. But DHCS does not itself provide "hospital services under the Medi-Cal program." The California legislature can reasonably only ever have expected that when DHCS forwards hundreds of millions of dollars in authorized HQAF funds to CHS, CHS would use them to provide hospital services under the Medi-Cal program, as the statute requires.

[8] The February 25, 2020 State Plan Amendment approval letter highlights the HQAF program's policy goals and the purpose for which HQAF funding is provided to private hospitals. Petition, pp. 12-13, ¶¶ 23-26.

- to be used exclusively to enhance federal financial participation for hospital services under the Medi-Cal program, to provide additional reimbursement to, and to support quality improvement efforts of hospitals, and to minimize uncompensated care provided by hospitals to uninsured patients, as well as to pay for the state's administrative costs and to provide funding for children's health coverage.  W&I Code § 14169.53(b)(1) (HQAF);

- 100% of supplemental payments under the HQAF program "shall be made to support the availability of hospital services and ensure access to hospital services for Medi-Cal beneficiaries." W&I Code § 14169.56(e)(1), also see W&I Code § 14169.57.  (HQAF);

- "DSH payments are intended to support health care services rendered by disproportionate share hospitals." W&I Code § 14105.98(b)  (DSH)[9];

- to address DSH hospitals' financial challenges "impeding their ability to continue serving their essential role in the health care delivery system, including providing care to Medi-Cal beneficiaries and uninsured patients"; without these funds, many DSH hospitals would close, "others would be forced to curtail services, thereby impacting services to Medi-Cal beneficiaries and other needy individuals." (W&I Code §§ 14166(b) (2), (3).) (Private DSH, Private Hospital Supplemental Fund (PHSF) program)

- Supplemental Medi-Cal payments from the Private Hospital Supplemental Fund (W&I Code § 14166.12), are available only to private hospitals, such as Fresno CRMC, that serve a high enough proportion of low-income patients to qualify as DSH hospitals pursuant to W&I Code §14105.98(e), and must "demonstrate a purpose[10] for additional funding including proposals relating to emergency services and other health care services, including infrequent yet high-cost services, …that are made available, or will be made available, to Medi-Cal beneficiaries."  W&I Code § 14166.12(s)(1)(D) (PHSF program).

Respondents wave away (as if "enacted over thirty years ago" means it need not be regarded) the requirement of W&I Code §14105.98(b) that DSH funding be spent only at DSH

---

[9] Subsection (b) is the first section, after definitions, in a lengthy statute that ends with subsection (an). Subsection (b) is as valid today as it was when the DSH Program was established in 1991, and remained unchanged through amendments in 1997, 1998 and 2000.

   W&I Code §§ 14105.98, *et. seq* provided DSH funding to private hospitals up until the 2005 enactment of the Medi-Cal Hospital/Uninsured Care Demonstration Project Act, W&I Code, §§ 14166, *et seq.*, which established the Private DSH Hospital Replacement Program (W&I Code § 14166.11) and the Private Hospital Supplemental Fund program (W&I Code § 14166.12).  See, *Examining the 2005 Medi-Cal Hospital Waiver*, California Health Care Foundation Issue Brief April 2006, pp.3-4, https://www.chcf.org/wp-content/uploads/2017/12/PDF-ExaminingThe2005MediCalWaiver.pdf.

[10] Fresno CRMC indisputably serves patients and demonstrates purposes qualifying it for Private Supplemental Medi-Cal funding.  Clovis CMC indisputably does not.

hospitals.  They fail to acknowledge that the requirement is incorporated into the Private DSH program[11]—under which only Fresno CRMC is entitled to expend the funds, but in violation of which CHS redirected that funding out to projects at its non-DSH Clovis facility.

 CHS insists that its Medi-Cal funding is unrestricted.  The Petition alleges the consequences in real time of Respondents' specious statutory interpretation:  the facts available on the public record demonstrate Respondents' disregard for the purpose of California's Medi-Cal statutes:

- Fresno CRMC and Clovis CMC's patient populations diverge widely in income level.  For example, in 2022, Fresno CRMC treated 85,000 Medi-Cal patients (71% of all Medi-Cal patients in CHS's system), and 11,700 uninsured patients (72% of all uninsured patients who sought treatment at a CHS hospital).  Petition, pp.29-30, ¶69.

- Notwithstanding its high volumes of indigent patients, Fresno CRMC has consistently generated by far the greatest share of Respondent's income—accounting for over two-thirds of both hospitals' net income and 75% of all net patient revenue—and consistently serves a much higher volume of patients than Clovis CMC.  Petition, p.24, ¶¶53-54.

- Fresno CRMC has been the principal source of Respondents' HQAF funding, and the sole source of Respondents' DSH and Private Hospital Supplemental Funding (PHSF) receipts.  Petition, p.25, ¶56.

- Clovis CMC has benefited from the lion's share of Respondent's capital projects (hundreds of millions of dollars, twenty times CRMC's increase), despite the fact that CRMC is a far larger hospital, with far more patients, and who have far greater needs.  Petition, pp.20-23,  ¶¶ 47-50.

- CHS operating income generated at Fresno CRMC, including supplemental Medi-Cal funding, directly funded (and facilitated extensive borrowing to fund) the Clovis campus investments.  Petition, p.22, ¶ 49; pp.25-26, ¶¶57-58.

- Respondents' extensive investments in its Community Health Partners provider network have delayed necessary infrastructure investments at CRMC.  Petition, pp.26-27, ¶¶60, 62.

- CHS has admitted to use of Supplemental Medi-Cal revenues for purposes other than

---

[11]  After the 2005 enactment of W&I Code, §§ 14166, *et seq.*, "Payments made pursuant to 14166.11 **shall be treated as payment adjustments made under Section 14105.98**…"  [emphasis added].  State Plan Amendment Attachment 4.19-A, Appendix 2 §j(1)(b), https://www.dhcs.ca.gov/formsandpubs/laws/Documents/Appendix%202%20to%20Attachment%204.19-A.pdf, p. 29N.

provision of medical care to Medi-Cal eligible patients.  Petition, p.23, ¶51 (CEO Craig Castro statement)

- CHS unauthorized uses of Medi-Cal funding violate specific Medi-Cal statutes.  Petition, pp.44-45, ¶¶106-108.

Finally, the Petition alleges the facts showing that Respondents' past and ongoing misuse of Supplemental Medi-Cal funding in violation of statutory intent has in fact substantially obstructed the purposes for which the funding was granted, including:

- Creating a growing gap in access to care for indigent CHS patients.  Petition, pp 63-64, ¶¶52.
- Allocating hundreds of millions of dollars in Supplemental Medi-Cal funding away from Fresno CRMC, where most CHS Medi-Cal patients are treated.  Petition, pp 33-34, ¶78.
- Allocating tens of millions of dollars in Supplemental Medi-Cal funding to the Community Health Partners provider network, whose members' practices are geographically remote from low-income neighborhoods, generally do not see patients at the downtown hospital, and frequently do not serve Medi-Cal patients at all. Petition, pp 40-41, ¶ 98.
- Disinvestment in CRMC, depriving CRMC Medi-Cal patients—who are far more likely to arrive at the hospital more gravely ill (¶70), homeless (¶71), mentally ill (¶71), or subject to adverse social determinants of health (¶72)—of the improvements CHS's Supplemental Medi-Cal funding should have made in safety, facilities, equipment, and staffing at CRMC.  Petition, pp 30-31; pp.26-27, ¶¶ 59-62.

### IV. The Court's lack of jurisdiction over Petitioners' declaratory relief claim requires remand to the state court.

The Petition, originally filed in the Superior Court, meets California's pleading standards under Code of Civil Procedure § 1060:

"a complaint for declaratory relief is legally sufficient if it sets forth facts showing the existence of an actual controversy relating to the legal rights and duties of the parties and requests that the rights and duties of the parties be adjudged by the court."  *Monterey Coastkeeper v. Cent. Coast Reg'l Water Quality Control Bd.*, 76 Cal. App. 5th 1, 13, 290 Cal. Rptr. 3d 787, 796 (2022), as modified (Mar. 28, 2022), review denied (June 1, 2022).

In California, stand-alone issues of statutory construction are a proper subject of declaratory relief.  *In re Claudia E.*, 163 Cal. App. 4th 627, 633, 77 Cal. Rptr. 3d 722, 727 (2008) ["The

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

proper interpretation of a statute is a particularly appropriate subject for judicial resolution"]; see also, *Alameda County Land Use Assn. v. City of Hayward,* 38 Cal.App.4th 1716, 45 Cal.Rptr.2d 752 (1995) [an action for declaratory relief lies when the parties are in fundamental disagreement over construction of particular legislation).[12]

However, relief under the federal Declaratory Judgment Act is in equity (*Samuels v. Mackell*, 401 U.S. 66, 70, 91 S. Ct. 764, 766, 27 L. Ed. 2d 688 (1971)), and is available only to a plaintiff with a cause of action under a separate statute. *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 878–79 (9th Cir. 2022); *Los Molinos Mut. Water Co. v. Ekdahl*, No. 2:21-CV-01961-DAD-DMC, 2024 WL 2302365, at *10 (E.D. Cal. May 21, 2024) [declaratory relief is a remedy, not a freestanding cause of action].

In this case, where the Court lacks equitable jurisdiction over Petitioners' first cause of action, the appropriate judicial response is remand to state court rather than to dismiss for lack of jurisdiction.  As the Ninth Circuit noted in *Polo v. Innoventions Int'l, LLC*, 833 F.3d 1193, 1196 (9th Cir. 2016), where defects of subject matter jurisdiction appear, "the district court generally *must* remand the case to state court, rather than dismiss it.  [citation.]  Remand is the correct remedy because a failure of federal subject-matter jurisdiction means only that the *federal* courts have no power to adjudicate the matter. State courts are not bound by the constraints of Article III. *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989)." [emphasis added].  See also, *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 970 n.6 (9th Cir. 2018) [where district court finds Article III standing problem in removed case, "the proper course is to remand for adjudication in state court"]; and, *Guthrie v. Transamerica Life Ins. Co.*, 561 F. Supp. 3d 869, 878 (N.D. Cal. 2021) [remand warranted where case began in state court and

---

[12] Petitioners have not filed and do not intend to pursue a taxpayer claim under California Code of Civil Procedure § 526a.  Doc.25-1, pp.15-16.

district court lacked jurisdiction over insureds' claims]).

### V. Petition satisfies Rule 8(a)'s requirements for pleading a right to relief under California Government Code § 11135.

#### A. Petitioners have alleged facts which if proved will show that Respondents' spending decisions disproportionately and unlawfully adversely affect their Black and Latino patients.

Petitioners assert that CHS has violated California Government Code's requirement that their hospitals provide all of their patients—regardless of race—full, equal, and non-discriminatory access to the benefits of programs and activities receiving funding from the State of California.  California Government Code § 11135(a); Petition, pp. 20-21, 41, 46-49.  ¶¶ 78-85, 99, 112-120.

The Petition alleges factual detail to support these claims—specifically, Respondents took the decision to create and expand palatial facilities in Clovis notwithstanding evidence of need at the Fresno hospital.  For example:

- the Fresno hospital patient towers had been built in 1957 and 1968 respectively, and required seismic upgrades to continue operating and investments in facilities, equipment, and innovation to stay competitive, attract patient transfers requiring higher levels of care and privately insured patients, recruit and retain CRMC staff, and specialists, residents, and fellows affiliated with UCSF Fresno.  Petition, pp.22-23, 29-30, ¶¶50, 60.

- the patient volumes at CHS's Fresno hospital were consistently significantly higher than at Clovis CMC, averaging 75% of all CHS patient census days and 66% of all CHS discharges over many years. Petition, p. 24, ¶¶ 53-54.

- equipment at the Fresno hospital was outdated because maintenance and replacements were not occurring timely.  Petition, pp 22-23, 40, ¶¶ 50, 96.

- at the Fresno hospital there were inadequate numbers of EMT beds in the Emergency Department, of operating suites, and of floor beds to accommodate the patient volume.  Petition, pp. 21-23, 30, 33, 36-38, 42-43, ¶¶ 48, 50, 61, 70, 88, 91.

- the Fresno hospital suffered from chronic staffing shortages, and conditions there were making it difficult to fully staff to ensure patient flow through the Emergency Department.  Petition, pp. 36-37, ¶88.

- racial and ethnic disparities between Fresno CRMC and Clovis CMC widened significantly between 2017 and 2022.  In 2017, CRMC patients were 49% Latino and 43% White.  But by 2022, White patients at CRMC had dropped by more than a third, to 28%, while increasing 25% at Clovis CMC, to 45.6%.  At CRMC, the proportion of Black patients rose from 2.8% to 10.9% over those five years, while the Latino patient percentage at Clovis CMC dropped by more than 16%.  Petition, p. 29, ¶¶ 67-68.[13]

- by 2022, 63.3% of the visits at CHS's Fresno hospital were Black or Latino patients (94,600), more than twice as many as Clovis hospital's (42,900) (44.1%).  Petition, pp. 28-29, ¶ 66.[14]

- essential specialists and services were moving out of reach of Fresno CRMC's patients, relocating to the Clovis hospital campus' new Outpatient Care Center, new Community Cancer Institute, new Heart & Lung Institute, new Endoscopy Center, new Wound Care Center, renovated surgery department, new imaging and radiology suites, and two new patient towers with 288 private rooms.  Petition, pp. 21-22, 38-40, ¶¶ 48, 92-98.

Notwithstanding this documented need for hundreds of millions of dollars in improvements to Fresno CRMC, and the fact that the patient population adversely affected by Respondents' failure to make those improvements was disproportionately Black and Latino, CHS's board decided to spend those hundreds of millions of dollars not on Fresno CRMC but on its Clovis facility instead—knowing that the beneficiaries of that investment would be a significantly higher-proportion white patient population.

---

[13] HCAI Patient Characteristics by County and Facility, 2022. Data Visualizations present a calendar year overview of patients. https://hcai.ca.gov/visualizations/patient-characteristics-by-county-and-facility/ (accessed May 12, 2024).

[14] California Department of Healthcare Access and Information ("HCAI") data: Patient Characteristics by County & Facility, 2022. See https://hcai.ca.gov/visualizations/patient-characteristics-by-county-and-facility/ (accessed on May 12, 2024).  HCAI data is submitted by CHS under penalty of perjury

Respondents err in suggesting that Petitioners simply allege that "that CCMC and CRMC are different hospitals…and the cities in which such hospitals are located have populations with different economic and racial compositions" (Doc.25-1, p.17:20-23)—as if CHS were helpless in the face of local demographics.  Petitioners bring this action to compel CHS to maintain, upgrade, staff, and resource Fresno's essential safety-net hospital to the same degree as CHS's suburban facility in Clovis—because CHS's obligation under California law requires it to deliver equally to all of its patient populations, *wherever they live*, "all of the operations and facilities of, or services, benefits, or aid provided by, a covered entity, directly or indirectly through others by grants, contracts, arrangements, or agreements."  2 California Code of Regulations § 14020(ii).

Respondents' confusion about the operation of the statute is inexplicable.  Obviously, the statute requires equitable provision of services across all of CHS's facilities.  Also obviously, an expenditure policy that creates dramatic improvements at the facility that serves significantly more white patients, at the direct expense (literally and figuratively) of the facility that serves significantly more Black and Latino patients, will predictably create exactly the kind of disparate adverse impact on protected classes that runs afoul of § 11135.  2 CCR § 14027(b)(3).  The Petition more than adequately meets Rule 8(a) pleading standards in this respect.

**B. Petitioners have standing to bring this action, and regulations implementing § 11135 are in accord.**

Petitioners as organizations, and on behalf of their staff members and clients, here seek enforcement of laws imposing a public duty on Respondents to provide non-discriminatory access to medical care.  Access to health care "for California residents who lack sufficient income to meet the costs of health care," "and without discrimination or segregation based purely on their economic disability" is a foundation stone of California's Medi-Cal system.  W&I Code § 14000(a).  The State accomplishes these public purposes in part by supplying funds to private hospitals, such as Respondents' Fresno and Clovis hospitals, to secure health care to Medi-Cal

15

eligible patients, including, but not limited to W&I Code §§ 14105.98, *et seq.*, 14166, *et seq.*, 14166.11, 14166.12, 14169.50, *et seq.*  It is self-evident that hospitals have a public duty to use these public funds for these public purposes, and that failure to do so impedes achievement of those purposes and defeats the legislative intent behind the funding.

Likewise, Government Code § 11135 requires that a private entity receiving state funding to provide health care[15] do so equitably, in such a way as to avoid adverse disparate impacts on protected classes.  2 CCR § 14027(b)(3).  Regulations promulgated to implement § 11135 "are established in order to … protect against unlawful discrimination and denial of full and equal access…" (2 CCR § 14000(b)); the statute and regulations "shall be construed liberally for the accomplishment of the purposes of this part."  2 CCR § 14000(d).

Petitioners have amply pled facts supporting their indisputable special interest in enforcement of these laws.  Petition, pp.5-6, ¶¶3-6.  Working daily to advance health equity and to ensure access to health care services for patients and prospective patients who rely on Fresno CRMC, they as non-profit organizations (and their staff members and clients as residents) have been suffering and continue to suffer economic and non-economic injury resulting from Respondents' failures and refusals to provide safe facilities, adequate staffing, modern equipment, access to specialty services, sufficient floor beds and surgical suites, and seismic upgrades at that facility.  Petitioners are thus "beneficially interested" parties with a special interest over and above the interest of the public at large—in fact with more than "sufficient interest in the subject matter of the dispute to press their case with vigor," which is the "purpose of a standing requirement."  *Common Cause v. Bd. of Supervisors*, 49 Cal.3d 432, 439, 777 P.2d 610, 613

---

[15] CHS is a "covered entity" within the meaning of § 11135 because it receives financial assistance from the state (2 CCR §§ 14000(a), 14020(ww)), and is principally engaged in the business of providing health care.  2 CCR § 14020(m)(6)(B).

(1989).

Finally, § 11135's implementing regulations firmly establish Petitioners' entitlement to bring this action:  as "aggrieved persons" within the meaning of 2 CCR §14020(d), in that they fall within the zone of interest protected by the statutes which authorize Supplemental Medi-Cal payments to private hospitals in California, and they believe they have been, are being, and are likely to be injured by Respondents' discriminatory practice of expending public funding so as to deny full and equal access to high quality medical care at Fresno CRMC; Petitioners' staff members and clients, as members of "protected classes" within the meaning of 2 CCR § 14020(jj) who apply for, participate in, benefit from or are unlawfully deterred or excluded from benefitting from programs, activities, or services of Respondents; and as "ultimate beneficiaries" of state funding within the meaning of 2 CCR § 14020(aaa).  Petition, ¶¶ 5 and 6.

Respondents' citations to *Blumhorst v. Jewish Family Services of Los Angeles,* 126 Cal. App. 4th 993 (2005), and *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1100 (S.D. Cal. 2017), do not avail them.  In *Blumhorst*, the appellate court upheld the trial court's grant of demurrer because for multiple reasons the plaintiff lacked standing.  *Blumhorst, supra*, at 1003-1004.  However, *Blumhorst* is inapposite, as it predates by almost two decades the current, more expansive regulations granting private rights of action under § 11135 (*e.g.*, 2 CCR §§ 14020(d), § 14020(jj), 2 CCR § 14020(aaa), and § 14050(b)).  Similarly, the *Prescott* decision involved a single individual's claim of one instance of discrimination, rather than an established pattern and practice of recurring violations such as are alleged here.  *Prescott, supra*, at 1102.

### C.  The Petition pleads facts supporting a disparate impact on protected classes within the meaning of Government Code § 11135.

Petitioners have alleged facts supporting a prima facie case, as prescribed in *Villafana v. County of San Diego,* 57 Cal. App. 5th 1012, 1017 (2020), that CHS's spending policies are actionable discrimination under § 11135:

17

1) The Petition alleges that CHS has adopted a neutral policy of resource allocation pursuant to which it:  has deployed corporate resources for new construction, remodeling, equipment, and staffing at its Clovis CMC hospital; has continued to sequester Fresno CRMC's cash reserves as security for bond debt incurred to improve Clovis CMC; has pledged all gross receivables at Fresno CRMC (including DSH as well as HQAF dollars) as security for that same bond debt; and, has established and continues to fund its Community Health Partners provider network using corporate revenues.  Petition, ¶¶ 57-59, 81, pp. 25-26, 34.

2)  The Petition alleges this policy has created a disproportionate adverse impact on one or more protected classes, in that the consequent disinvestment in Fresno CRMC has disadvantaged the patients who treat at that hospital, the great majority of whom are members of protected classes, specifically Black and Latino.  Petition, ¶¶ 64, 78-79, 83-85, 88-99, pp. 28, 33-41.

The regulations implementing § 11135 set out the types of evidence and proof appropriate in disparate impact discrimination cases.  Petitioners have pled facts (¶¶ 79-99) entitling them to a trial on the merits, at which they can proffer evidence of disparate impact, which may include statistical or other evidence that:

"(1) a group of individuals, other than members of a protected class, receive better or more effective benefits of the program or activity than members of a protected class or that the same benefits are more burdensome to obtain for members of a protected class;

"(2) the benefits of the program were reduced, less effective, or more burdensome to obtain when members of a protected class were eligible for, or participated in, a program or activity to a greater extent than in the past;

"(3) the program or activity creates, increases, reinforces, or perpetuates segregation on the basis of membership in a protected class;

"(4) a particular condition to receiving benefits of the program disproportionately excludes individuals on the basis of membership in a protected class from

18

participation in or receipt of the benefits of the program; or

"(5) the objectives of the program or activity were defeated or substantially impaired for members of a protected class."

2 CCR § 14029(a).

The total group to which CHS's expenditure policy undeniably applies is the universe of all patients treated at CHS's acute care hospitals.  The appropriate comparator groups are Fresno CRMC patients and Clovis CMC patients—which should be compared to each other as a proportion of CHS's patient population as a whole.  This is exactly the mechanism *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 519-520 (9th Cir. 2011) prescribes for identifying comparator groups.

Respondents however propose that the comparator groups should for some reason include "every person in the geographic or regional sphere of CRMC."  Doc.25-1, 19:22-23.  In practice, such a formulation would create precisely the problem identified in *Villafana v. County of San Diego*, 57 Cal. App. 5th 1012, 1018 (2020).  The *Villafana* court rejected the plaintiffs' use of the general population as a relevant comparator group; a telling comparison must be between groups to which "the facially neutral policy has been or can be applied."  *Id*. at 1018.  Petitioners here allege CHS's disinvestment policies at Fresno CRMC have created disparate impacts on Black and Latino patients within the CHS system—that significantly more patients of color are treated at CRMC and therefore the impacts of the policies fall disproportionately on those populations, as compared to the much higher-proportion white patients at Clovis CMC, who are also subject to CHS policies, but who are advantaged by them.  To take as a comparator group all persons in Fresno County (even though 90+% of CHS patients are county residents) would bring in hundreds of thousands of individuals not even arguably subject to CHS policies—either because they choose one of several other non-CHS hospitals in the Fresno region for their care, or because they do not have occasion to seek treatment at any hospital.  This would clearly be erroneous

under *Villafana*. *Id.* [16]

Respondents misapprehend Petitioners' claims when they suggest Petitioners use "low-income" as a proxy for "Black and Latino."  In fact, these are separate populations, that happen to overlap to a greater or lesser degree depending on many factors.  There are wealthy Black and Latino patients who never go near Fresno CRMC—they have private insurance, and automobiles, and can exercise choice about where they seek hospital care, so they go to Clovis CMC.  There are indigent white patients—for example, by far the majority of the homeless, almost all of whom are treated at Fresno CRMC—who have Medi-Cal, or no insurance, and end up at the downtown hospital not by choice but because care at Clovis is effectively inaccessible to them.

Under their first cause of action, Petitioners challenge CHS's misuse of Supplemental Medi-Cal funding because, among other reasons, it violates W&I Code § 14000's goal to ensure Medi-Cal recipients can obtain health care "in the same manner as the public generally and without *discrimination* or segregation *based on economic disability*."  [emphasis added.]  Under their second cause of action, Petitioners challenge CHS's misuse—not just of its Supplemental Medi-Cal funding but of all its corporate resources[17]—to create a disparate impact on the very high numbers of Black and Latino patients who rely on Fresno CRMC for their health care.

Finally, at Doc. 25-1, 22:6-16 Respondents rehearse a list of confused ideas about Petitioners' claims.  These include the erroneous suggestion that Petitioners base their § 11135 claim on comparator groups derived from patients' zip code of origin.  Respondents also

---

[16] Respondents' reliance on *In re County Inmate Telephone Service Cases*, 48 Cal. App. 5th 354, 362 (2020), is similarly flawed.  In *County Inmate Telephone Services*, only inmates were affected by the policy in question, but plaintiffs posited the general population (who were not subject to the policy) as the comparator group.  In the within case, CHS's challenged policy similarly does not apply to the general population; the comparator groups must fall within the universe of CHS hospital patients.

[17] Section 11135's proscription on disparate impact extends to all operations of a covered entity, whether or not they receive direct state support, and even if only one part of the covered entity receives state support.  2 CCR 14020(ii)(1).

mischaracterize the Petition, and then unwittingly acknowledge that "every patient that visits each respective hospital is equally affected by the decisions made by Respondents with respect to such hospitals." Doc. 25-1, 22:14-16. Petitioners agree, 100%. In 2022, of all CHS patients who are Black and Latino, almost 70% of them were treated at Fresno CRMC, where Respondents' "decisions with respect to that hospital" included massive disinvestment resulting in crumbling facilities, outdated equipment, inadequate staffing, obstructed access to specialty care, seismic risk, etc., etc. Compare to the 52% of CHS's white patients who were treated at Clovis CMC, where Respondents' "decisions with respect to *that* hospital" included almost a billion dollars in new and remodeled facilities, state of the art equipment, convenient access to medical specialists, and that beautiful million-dollar chandelier in reception.

These very different care environments did not occur organically, or by accident. They are the result of Respondents' intentional funneling of resources away from the hospital that disproportionately serves populations of color, and into the hospital that disproportionately serves white patients. This is the very definition of non-protected classes "receiv[ing] better or more effective benefits of the program or activity than members of a protected class." 2 CCR § 14029(a)(1). Petitioners have amply met Rule 8(a)'s pleading requirements.

**VI.   CONCLUSION**

If Respondents actually "remain deeply committed to their mission to better the lives of *all* those served by CHS" (Doc. 25-1, 22:23-24), there is no reason for them to rack up astronomical attorneys' fees in an effort to avoid accountability. This is not a mere quibble about "priorities" (22:27); however much Respondents prefer not to have anybody "dictate how CHS should use its resources" (22:25). Until they are willing to ensure actual equitable provision of care as the law requires, they will be facing challenges like this one.

Petitioners respectfully request that this Court immediately remand this matter to state

court for a prompt resolution of the issues.  Failing that, Petitioners request that the Court deny the motion to dismiss in its entirety.  If the Court finds the Petition to have failed the Rule 8(a) test in any way, Petitioners respectfully request leave to amend.

Dated:  November 20, 2024                             Respectfully submitted,


                                                      /s/ Patience Milrod              .

                                                      Patience Milrod
                                                      Attorney for Petitioners